IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GLYNN SIMMONS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. CIV-24-97-J |
| v. | ) | |
| | ) | |
| CITY OF EDMOND, Special | ) | |
| Representative of the Estate of former | ) | |
| Detective Sergeant ANTHONY DAVID | ) | |
| GARRETT, CITY OF OKLAHOMA | ) | |
| CITY, former Detective CLAUDE L. | ) | |
| SHOBERT, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff GLYNN SIMMONS, by his attorneys, LOEVY & LOEVY, NORWOOD

LAW FIRM, P.C., and COYLE LAW FIRM, complains of Defendants CITY OF

EDMOND, Special Representative of the Estate of former Detective Sergeant DAVID

ANTHONY GARRETT, CITY OF OKLAHOMA CITY, and former Detective CLAUDE

L. SHOBERT, as follows:

### Introduction

1.      Plaintiff Glynn Simmons was wrongfully convicted of the 1974 murder of

Carolyn Sue Rogers, a clerk at a liquor store in Edmond, Oklahoma, and sentenced to

death. Although his death sentence was later converted to life in prison in 1978, Mr.

Simmons spent nearly half a century unjustly imprisoned before he was exonerated in

2023.

2.      Mr. Simmons had nothing to do with the shooting and has always maintained his innocence.

3.      Not one piece of physical evidence ever connected Mr. Simmons to the Rogers murder.

4.      The only evidence against Mr. Simmons at his June 1975 trial was the testimony of Belinda Brown, a victim of the robbery, who testified that she identified Mr. Simmons at lineups. Brown had been shot in the back of the head during the robbery but survived.

5.      Defendants fabricated police reports claiming that Brown identified Glynn Simmons and a co-defendant, Don Roberts, at lineups conducted in February 1975.

6.      However, unbeknownst to Plaintiff, his counsel, or the prosecutors at the time, Brown never identified Glynn Simmons or Don Roberts. Instead, Brown had identified *other individuals* (including one of the true perpetrators) during the lineups, which Defendants documented in police reports but never disclosed to Plaintiff, his counsel, or the prosecutors.

7.      These exculpatory police reports were knowingly and deliberately suppressed by the Defendants in order to frame Plaintiff for a crime he did not commit.

8.      The Defendants built an entirely false case against Mr. Simmons by fabricating evidence, including the false inculpatory testimony by Brown and police reports, and suppressing exculpatory evidence that Plaintiff could have used to defend himself in the criminal case against him.

9.      As a result of these fabrications and false statements, and the suppression of exculpatory evidence, Mr. Simmons was convicted of murder. He spent 49 years wrongfully imprisoned.

10.     Mr. Simmons's arrest, prosecution, and conviction were based on shocking actions by the Defendants.

11.     Never giving up on proving his innocence, Mr. Simmons worked tirelessly to show that he had absolutely nothing to do with this crime.

12.     In 2023, after an evidentiary hearing on a post-conviction petition, Mr. Simmons's conviction was vacated. The charges against him were dismissed in September 2023. Nearly a half century after his terrible ordeal began, Mr. Simmons was finally exonerated.

13.     Mr. Simmons now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and terrible hardship that he has endured and continues to suffer as a result of the Defendants' actions.

**Jurisdiction and Venue**

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

15.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

16.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, most or all of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Parties**

17.     Plaintiff Glynn Simmons is a 70-year-old Black man born and raised in Louisiana.

18.     The Special Representative of the Estate of Anthony David Garrett is named as Defendant in their capacity as a special representative of Garrett's estate, to defend Garrett in this action. At all relevant times, Garrett was a police detective sergeant and employee in the Edmond Police Department acting under color of law and within the scope of his employment for the City of Edmond.

19.     Defendant City of Edmond is an Oklahoma municipal corporation, operates the Edmond Police Department, and was at all times relevant hereto the employer of Anthony David Garrett. The City of Edmond is liable for the acts of Garrett, which were undertaken within the scope of his employment with the City of Edmond.

20.     At all times relevant hereto, Claude L. Shobert was a police detective and employee in the Oklahoma City Police Department acting under color of law and within the scope of his employment for the City of Oklahoma City.

21.     All individual Defendants are sued in their individual capacities unless otherwise noted.

22.     Defendant City of Oklahoma City is an Oklahoma municipal corporation, operates the Oklahoma City Police Department, and was at all times relevant hereto the employer of Defendant Shobert. The City of Oklahoma City is liable for the acts of Defendant Shobert, which were undertaken within the scope of his employment with the City of Oklahoma City.

**The Crime**

23.       In the late evening hours of December 30, 1974, two men robbed a liquor store in Edmond, Oklahoma and murdered one of the clerks, Carolyn Sue Rogers.

24.       The culprits also shot Belinda Brown, a customer, in the back of the head.

25.       Brown had just walked in when she was shot and had only been able to view the suspects for a few seconds.

26.       Fortunately, Brown recovered from the gunshot wound and was released from the hospital after several days.

27.       Mr. Simmons and his co-defendant, Don Roberts, had absolutely nothing to do with this crime and are completely innocent.

28.       At the time of the crime, Mr. Simmons was over 700 miles away in Harvey, Louisiana, celebrating the holidays with his family and friends.

29.       Plaintiff did not even move to Oklahoma from Louisiana until January 1975.

30.       Likewise, Don Roberts was over 200 miles away in Dallas, Texas, with family and friends at the time of the crime.

**Brown's Many Conflicting Statements**

31.       When Belinda Brown was interviewed four days after the robbery, her description of the suspects was vague and unhelpful. She told Defendant Garrett[1] that she

---

[1] For ease of reference, Garrett will be referred to as "Defendant Garrett," rather than the special representative of his estate.

did not believe she could remember more if given more time because "it would get all jumbled up in my mind."

32.      Brown went on to participate in approximately eight different lineups and identified at least five different individuals as suspects.

33.      Defendants Garrett and Shobert were present at all of these lineups and knew that Brown made multiple, conflicting identifications. Yet, Defendants Garrett and Shobert did not disclose all of this exculpatory evidence.

34.      There were also numerous discrepancies in Brown's description of the suspect and Plaintiff. For instance, Plaintiff is much shorter than Brown's description of the suspect.

35.      Brown also gave conflicting statements on whether the suspect had a beard and whether she saw a car outside the liquor store.

**Defendants' Fabrication and Suppression**

36.      On February 7 and 8, 1975, Brown viewed lineups constructed by Defendants Garrett and Shobert.

37.      The lineups included Delbert and Leonard Patterson.

38.      The Patterson brothers were in custody and available to place in a lineup because they had confessed to a separate murder.

39.      The lineups also included Don Roberts and Glynn Simmons.

40.      Mr. Simmons was in custody and available to place in a lineup because he had been arrested on suspected involvement in unrelated robbery cases in Oklahoma City.

41.    Defendants Garrett and Shobert created a police report dated February 10, 1975 ("February 10th Report") that stated Brown identified Delbert Patterson and another individual who was not Plaintiff during the lineups on February 7 and 8, 1975.

42.    The February 10th Report was suppressed by Defendants Garrett and Shobert and never disclosed to Plaintiff, his counsel, or the prosecutors.

43.    The fact that Brown did not identify Plaintiff or Don Roberts but instead identified Delbert Patterson and another individual in the lineups was suppressed by Defendants Garrett and Shobert and never disclosed to Plaintiff, his counsel, or the prosecutors.

44.    In addition, Defendants Garrett and Shobert fabricated a report dated February 8, 1975 ("Special Showup Report"), that indicated that Brown identified Plaintiff and Don Roberts as the perpetrators.

45.    This Special Showup Report was signed by Defendant Shobert.

46.    The Special Showup Report was false and fabricated because Brown did not identify Plaintiff or Don Roberts as the perpetrators.

47.    Brown's purported identification of Plaintiff and Don Roberts was fabricated by Defendants Garrett and Shobert.

48.    Defendants Garrett and Shobert manipulated Brown into falsely identifying Plaintiff and Don Roberts.

49.    Defendants Garrett and Shobert suppressed the fact that they fabricated evidence and manipulated Brown's identification; they never disclosed this information to Plaintiff, his counsel, or the prosecutors.

50.    Plaintiff's arrest was based solely on the evidence suppressed and fabricated by Defendants Garrett and Shobert. There was never any probable cause to suspect Plaintiff of the liquor store robbery and murder.

## Unduly Suggestive Identification Procedure

51.    The identification procedure created by Defendants Garrett and Shobert was also unduly suggestive.

52.    For instance, Defendants Garrett and Shobert allowed three witnesses—Belinda Brown, Norma Hankins, and Johnny Delbrio (who claimed to have seen a car outside the store)—to view the lineups at the same time. Defendants designed this so that the witnesses would influence each other's testimony.

53.    In addition, Defendants Garrett and Shobert placed multiple suspects in the lineups at the same time.

54.    Defendants Garrett and Shobert placed individuals in the lineups who did not resemble each other in height, weight, and other physical characteristics.

55.    Plaintiff was not similar in physical appearance to the other individuals in the lineup.

## Plaintiff's Arrest, Prosecution, and Wrongful Conviction

56.    Due to Defendants Garrett's and Shobert's suppression of exculpatory evidence and fabrication of false, inculpatory evidence against him, Plaintiff was arrested, prosecuted, and convicted for the robbery and murder of Carolyn Sue Rogers.

57.     The only inculpatory evidence presented against Plaintiff at his trial in June 1975 was the evidence fabricated by Defendants Garrett and Shobert—namely, Belinda Brown's false identification.

58.     Like the fabricated and suppressed police reports, Brown's fabricated identification was used to arrest, prosecute, and convict Plaintiff of the robbery and murder.

59.     At the conclusion of the trial, Plaintiff was sentenced to death. His death sentence was later converted to life in prison.

60.     In the absence of Defendants Garrett's and Shobert's actions as described herein, Plaintiff would never have been arrested, prosecuted, or convicted. At no point in time between 1974 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the robbery and murder.

61.     Defendants Garrett's and Shobert's fabrication of evidence was not disclosed to Plaintiff, his counsel, or the prosecutors, in advance of or at the time of the criminal trial.

62.     Defendants Garrett and Shobert also suppressed evidence that exculpated and exonerated Plaintiff and withheld it from Plaintiff, his counsel, and the prosecutors.

63.     Defendants Garrett and Shobert used false police reports to cover up their actions. They provided those false reports to prosecutors, and those reports became the basis for charging and prosecuting Plaintiff.

64.     Defendants Garrett and Shobert also gave false statements to prosecutors and provided false testimony at Plaintiff's criminal trial.

65.    In addition, on information and belief, Defendants Garrett and Shobert suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

66.    If the prosecutors had known that Defendants Garrett and Shobert fabricated evidence, and/or suppressed exculpatory evidence, they would not have pursued the prosecution of Mr. Simmons, and his unlawful detention would not have been continued.

67.    At all times relevant hereto, it was the policy of the attorneys in the prosecutor's office to disclose all exculpatory evidence of which they were aware.

68.    The exculpatory evidence described in the preceding paragraphs was not provided by Defendants Garrett or Shobert or any member of the Edmond Police Department or Oklahoma City Police Department to any member of the prosecutor's office.

69.    Given that the entirety of the State's case against Plaintiff rested on Brown's testimony, the exculpatory evidence described in the preceding paragraphs was material, if not critical, to Mr. Simmons's defense of the criminal charges against him.

**Plaintiff's Exoneration**

70.    Throughout his prosecution and before and after his conviction, Plaintiff continued to maintain his innocence and pursued all legal avenues to prove it.

71.    Decades after his conviction, Plaintiff, through an investigator, finally obtained the exculpatory February 10th Report that had been suppressed by Defendants Garrett and Shobert.

72.    With new post-conviction counsel, Plaintiff was able to file a petition for post-conviction relief in 2022.

73.    During the proceedings, the State of Oklahoma acknowledged that Plaintiff's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), had been violated and agreed to the vacatur of Plaintiff's conviction and a new trial.

74.    After an evidentiary hearing, the state court found that the February 10th Report had been unlawfully suppressed and Plaintiff was denied the right to a fair trial. The state court vacated Plaintiff's conviction and granted him a new trial in July 2023.

75.    On September 19, 2023, the criminal charges against Plaintiff were dismissed with prejudice.

### The Cities' Policies, Practices, and Customs

76.    The actions of Defendant Garrett as described herein were consistent with the policies, practices, and customs of the Defendant City of Edmond.

77.    The actions of Defendant Shobert as described herein were consistent with the policies, practices, and customs of the Defendant City of Oklahoma City. [2]

78.    The actions of Defendants Garrett and Shobert described herein were undertaken pursuant to the policies and practices of the Cities and their respective police departments, in that Edmond and Oklahoma City police officers regularly used unconstitutional measures during the relevant time periods to falsely implicate criminal suspects, including by withholding or suppressing exculpatory evidence, fabricating

_____

[2] The City of Edmond and City of Oklahoma City will henceforth be referred to collectively as "Cities."

evidence, feeding information to or manipulating witnesses, and engaging in unduly suggestive identification and lineup procedures. These were widespread, clear, and persistent patterns and practices of officers in the Edmond and Oklahoma City Police Departments in the years around, prior to, and leading up to Plaintiff's 1975 conviction.

79.      At all times relevant herein, the Cities and their respective police departments had no policies or inadequate policies, procedures, rules, or regulations relating to police officers' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory or impeachment evidence, or any such policies were woefully inadequate. The Cities and their respective police departments deliberately chose not to adopt any or adequate policies on officers' obligations to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), even though the need for such policies was obvious and the likelihood of recurring violations clear.

80.      At all times relevant herein, the Cities and their respective police departments had no policies or inadequate policies, procedures, rules, or regulations regarding the conduct of lineups, or the writing of police reports or notes of witness statements. The Cities and their respective police departments deliberately chose not to adopt any or adequate policies regarding the conduct of lineups, and the writing of police reports or notes of witness statements, even though the need for such policies was obvious and the likelihood of recurring violations clear.

81.      The failure to maintain adequate policies on these topics posed an obvious risk of violation of the constitutional rights of Plaintiffs and other criminal defendants.

This failure to main adequate policies therefore constituted deliberate indifference on the part of the Cities.

82.    At all times relevant herein and for a period of time prior thereto, the Cities had notice of a widespread practice by its officers under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and/or were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

83.    Upon information and belief, the final policymakers for the Cities and their respective police departments were on notice before 1975 that their policies were inadequate and outdated, likely to lead to constitutional violations by police officers, and needed to be revised to ensure that officers complied with the law.

84.    The widespread practices were so well-settled as to constitute *de facto* policy in the Edmond and Oklahoma City Police Departments, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

85.    In addition, at all times relevant herein, the Cities and their respective police departments did not provide any or adequate training or supervision to Edmond or Oklahoma City police officers with respect to their obligation to disclose exculpatory and impeachment evidence, the conduct of lineups or identification procedures, or writing of police reports and notes on witness statements.

86.    The importance of and need for training was known to final policymakers of the Cities in and prior to 1975.

87.    Upon information and belief, at all times relevant herein, final policymakers knew of these problems, allowed them to continue, and made decisions not to implement adequate training or supervision.

88.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Edmond and Oklahoma City police officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct lineups, and how to write police reports or notes of witness statements. The Cities made a conscious choice not to properly train, supervise, or discipline its officers or provide adequate policies on these issues.

89.    The Cities and their respective police departments decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or citizens' constitutional rights, or who fabricated evidence or manipulated witnesses or created unduly suggestive lineups, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

90.    The policies and practices of the Cities and their respective police departments were the moving force behind the violation of Plaintiff's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Cities directly encouraged and were thereby the moving force behind the very type of actions at issue by failing to adequately train, supervise, and discipline

their officers who withheld exculpatory evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

91.     Final policymakers for the Cities on matters relating to the respective police departments knew, among other things, that there was a need to train and supervise police officers and that the their existing policies were outdated and needed to be updated to include policies on how to handle, preserve, and disclose exculpatory and impeachment evidence, how to conduct lineups or other identification procedures, and how to write police reports or notes of witness statements.

92.     The deficient policies and practices described herein caused other criminal defendants to be wrongfully convicted, putting policymakers on notice of the problem.

93.     The Cities are liable because the violation of Plaintiff's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for these Defendant Cities.

94.     As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries as set forth herein.

**Plaintiff's Damages**

95.     Plaintiff Glynn Simmons was only 22 years old when his ordeal began. He spent the next half century imprisoned for a crime he did not commit. And, until his death sentence was converted to life in prison, he believed that he would be put to death by the State of Oklahoma.

96.     Plaintiff's nearly 49 years of wrongful incarceration is the longest period ever served prior to exoneration in the history of the United States.

97.     In serving the majority of his life to date behind bars, Plaintiff was wrongfully deprived of his entire young and middle adulthood. He must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

98.     The emotional pain and suffering caused by losing 49 years of life to prison has been enormous. During his incarceration, Plaintiff was stripped of the various pleasures of basic human experiences, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to marry, raise children, and pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

99.     For example, as a result of his decades in prison, Plaintiff lost his chance to raise his son, who was only three years old when Plaintiff was arrested and taken from his family.

100.    As a result of the foregoing, Plaintiff has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' actions.

**COUNT I—42 U.S.C. § 1983**
**Due Process Right to a Fair Trial**
**(Fourteenth Amendment)**

101.    Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

102.    In the manner described more fully above, Defendants Garrett and Shobert, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner described more fully above, Defendants Garrett and Shobert deliberately withheld exculpatory evidence from the Plaintiff and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

103.    In addition, as described above, Defendants Garrett and Shobert knowingly fabricated and solicited false evidence implicating Plaintiff in the crime, obtained Plaintiff's arrest, prosecution, and conviction using that false evidence, and failed to correct fabricated evidence that the knew to be false when it was used against Plaintiff during his criminal case. In addition, Defendants Garrett and Shobert produced false reports which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements that were fabricated and that Defendants knew to be false. As discussed herein, the use of the fabricated evidence deprived Plaintiff of liberty.

104.    In addition, based upon information and belief, Defendants Garrett and Shobert concealed and fabricated additional evidence that is not yet known to Plaintiff.

105.    In the manner described more fully above, Defendants Garrett and Shobert also procured the supposed eyewitness identification of Plaintiff, implicating him in the crime, by using unduly suggestive identification techniques. Defendants used the resulting false identification to taint Plaintiff's criminal trial. The identification procedures were so unnecessarily suggestive and conducive to irreparable mistaken identification that the identification's use violated due process of law.

106.    The actions of Defendants Garrett and Shobert resulted directly in the unjust and wrongful criminal prosecution and conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent these actions, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

107.    The actions of Defendants Garrett and Shobert were objectively unreasonable and were undertaken intentionally, in total disregard of the truth and Plaintiff's clear innocence.

108.    As a result of the actions of Defendants Garrett and Shobert, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages.

109.    The actions described in this Count by Defendants Garrett and Shobert were undertaken pursuant to the policies and practices of the Defendants City of Edmond and City of Oklahoma City, in the manner described above and more fully described below in Count V.

**COUNT II—42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

110.     Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

111.     In the manner described more fully above, Defendants Garrett and Shobert, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity, seize him, and cause his detention and continued confinement and prosecution without probable cause.

112.     In so doing, Defendants Garrett and Shobert caused Plaintiff to be deprived of his liberty, seized, and detained without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

113.     Plaintiff's criminal prosecution was terminated without a conviction. The criminal charges against him were dismissed with prejudice.

114.     The actions of Defendants Garrett and Shobert were objectively unreasonable and were undertaken intentionally and maliciously, and in total disregard of the truth and Plaintiff's clear innocence.

115.     As a result of the actions of Defendants Garrett and Shobert, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages.

116.     The actions described in this Count by Defendants Garrett and Shobert were undertaken pursuant to the policies and practices of the Defendants City of Edmond

and City of Oklahoma City, in the manner described above and more fully described below in Count V.

## COUNT III—42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

117.     Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

118.     Defendants Garrett and Shobert, acting in concert with each other and other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby deprive him of his constitutional rights, all as described herein.

119.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

120.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

121.     Defendants Garrett and Shobert were acting under color of law and within the scope of their employment when they took these actions.

122.     The actions of Defendants Garrett and Shobert were objectively unreasonable and were undertaken intentionally, in total disregard of the truth and Plaintiff's clear innocence.

123.     As a result of the actions of Defendants Garrett and Shobert, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages.

124.     The actions described in this Count by Defendants Garrett and Shobert were undertaken pursuant to the policies and practices of the Defendants City of Edmond and City of Oklahoma City, in the manner described above and more fully described below in Count V.

## COUNT IV—42 U.S.C. § 1983
## Failure to Intervene

125.     Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

126.     In the manner described more fully above, during the constitutional violations described herein, one or more of Defendants Garrett and Shober stood by without intervening to prevent the violation of Plaintiff's rights under the First and Fourth Amendment, even though they had the opportunity to do so.

127.     The actions of Defendants Garrett and Shobert were objectively unreasonable and were undertaken intentionally, in total disregard of the truth and Plaintiff's clear innocence.

128.     As a result of the actions of Defendants Garrett and Shobert, Plaintiff suffered loss of liberty, great mental anguish, humiliation, emotional pain and suffering, and other grievous and continuing injuries and damages.

129.     The actions described in this Count by Defendants Garrett and Shobert were undertaken pursuant to the policies and practices of the Defendants City of Edmond and City of Oklahoma City, in the manner described above and more fully described below in Count V.

## COUNT V—42 U.S.C. § 1983
### Policy and Practice Claim against City of Edmond and City of Oklahoma City

130.     Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

131.     As described above, the Defendant City of Edmond and City of Oklahoma City is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

132.     Plaintiff's injuries were caused by the express or official policies, absence of necessary express policies, and widespread practices and customs of the Cities, as well as by the actions of policymaking officials for the Cities.

133.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the Cities failed to promulgate any or adequate rules, regulations, policies or procedures on: the handling, preservation, and disclosure of exculpatory evidence; the writing of police reports and notes of witness statements; the conduct of lineups and identification procedures; and meaningful discipline of officers accused of such unlawful conduct.

134.     In addition or in the alternative, the Cities failed to train, supervise, or discipline officers of their respective police departments, on the above topics. The Cities

chose not to implement any or adequate policies and training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

135.    The failure to promulgate proper or adequate rules, regulations, policies, procedures and training was committed by final policymakers or those delegated final policymaking authority.

136.    At all times relevant herein, final policymakers for the Cities knew of these problems and allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

137.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Edmond and Oklahoma City police officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory evidence; how to conduct proper identification procedures, including lineups; and how to write police reports and notes of witness statements.

138.    The policies, practices, and customs set forth above were maintained and implemented with deliberate indifference. They were the moving force behind the constitutional violations described above and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VI—Indemnification

139.     Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

140.     Oklahoma law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

141.     Defendant Garrett was an employee of the Edmond Police Department who acted within the scope of his employment in committing the actions described above.

142.     The City of Edmond is required to indemnify any compensatory damages judgment awarded against the special representative of Garrett's estate.

143.     Under the City of Edmond municipal code, the City of Edmond is required to indemnify any judgment in favor of Plaintiff against the special representative of Garrett's estate because Garrett did not engage in "gross negligence," nor were his actions described in this Complaint "misconduct in the performance of his duty to the City" in that his actions were expressly authorized, sanctioned, and undertaken pursuant to the policies, practices, and training of the Edmond Police Department and the City of Edmond.

144.     Defendant Shobert was an employee of the Oklahoma City Police Department who acted within the scope of his employment in committing the actions described above.

145.     The City of Oklahoma City is required to indemnify any compensatory damages judgment awarded against Defendant Shobert.

146.    Under the Oklahoma City municipal code, the City of Oklahoma City is required to indemnify Defendant Shobert against any claims, demands and judgments for damages up to and including the sum of $10,000,000.00 to Plaintiff for the claims arising out of the violation of Plaintiff's federal civil rights.

WHEREFORE, Plaintiff Glynn Simmons respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, punitive damages, costs, attorneys' fees, and interest, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Glynn Simmons hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

s/ Joseph Norwood
One of Plaintiff's Attorneys

Jon Loevy*
Jordan Poole*
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: (312) 243-5900

Elizabeth Wang*
Loevy & Loevy
2060 Broadway, Ste. 460
Boulder, CO 80302
O: (720) 328-5642
*attorney admission applications forthcoming

Joseph Norwood
Norwood Law Firm P.C.
1717 S. Cheyenne Ave.
Tulsa, OK 74119
O: (918) 582-6464

John Coyle, III
Coyle Law Firm
125 Park Ave., Ste. 100
Oklahoma City, OK 73102
O: (405) 232-1988