IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GLYNN SIMMONS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 5:24-cv-97-J |
| v. | ) | |
| | ) | |
| CITY OF OKLAHOMA CITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SHOBERT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 124]**

Jon Loevy
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: (312) 243-5900
jon@loevy.com
poole@loevy.com

John Coyle, III
COYLE LAW FIRM
125 Park Ave., Ste. 100
Oklahoma City, OK 73102
O: (405) 232-1988
jc@coylelaw.com
*Counsel for Plaintiff*

Elizabeth Wang
LOEVY & LOEVY
Boulder, CO 80302
O: (720) 328-5642
elizabethw@loevy.com

Joseph Norwood
NORWOOD LAW FIRM P.C.
1717 S. Cheyenne Ave.
Tulsa, OK 74119
O: (918) 582-6464
joe@oklahomaadvocate.com

## TABLE OF CONTENTS


RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS . . . . . . . . . . . 1

ADDITIONAL STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. Shobert's Sham Declaration Is Inadmissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II. A Trial Is Required on Plaintiff's *Brady* Claim . . . . . . . . . . . . . . . . . . . . . . . . . 22

A. The Information in the February 10, 1975 Report Was Exculpatory and Shobert Deliberately, Knowingly, or Recklessly Withheld It . . . . . . . . . . . . . . . . . . . . . . . . 23

B. A Reasonable Jury Could Find the Information in the February 10, 1975 Lineup Report Was Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III. A Trial Is Required on Plaintiff's Fabrication of Evidence Claim . . . . . . . . . . . . . . . 35

IV. A Trial Is Required on Plaintiff's Unduly Suggestive Identification Claim . . . . . . . . 42

V. A Trial Is Required on Plaintiff's Fourth Amendment Claim . . . . . . . . . . . . . . . . . . . 45

VI. A Trial Is Required on Plaintiff's Conspiracy Claim . . . . . . . . . . . . . . . . . . . . . . . . 46

VII. Qualified Immunity Is Contrary to the Text of Section 1983 . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Anthony v. Baker*, 767 F.2d 657 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Argo v. BCBS of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . 20, 21

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . 24, 37

*Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842 (4th Cir. 1964) . . . . . . . . . . . . . . . 27, 33

*Black v. West Virginia State Police*, 2023 WL 6520079 (S.D.V.W. 2023) . . . . . . . . . . . . . 37

*Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . 33, 40, 45, 46

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 33

*Brown v. Mississippi*, 297 U.S. 278 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Burks v. Egeler*, 512 F.2d 221 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . 34

*Castleberry v. Crisp*, 414 F. Supp. 945 (N.D. Okla. 1976) . . . . . . . . . . . . . . . . . . . . . . . 26

*Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556 (2024) . . . . . . . . . . . . . . . . . . . . . . . 45

*Coones v. Unified Gov't of Wyandotte Cnty./Kansas City*, 2024 WL 4345819 (D. Kan. Sept. 30, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Ezell v. City of Chicago*, 2023 WL 5287919 (N.D. Ill. 2023) . . . . . . . . . . . . . . . . . . . . . . 27

*Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Foster v. California*, 394 U.S. 440 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Giglio v. United States*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33

*Giles v. Maryland*, 386 U.S. 66 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 33

*Grayson v. City of Aurora*, 157 F. Supp. 3d 725 (N.D. Ill. 2016) . . . . . . . . . . . . . . . . . . . 27

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Handy v. Dobbin*, 2022 WL 5067710 (10th Cir. Oct. 5, 2022) . . . . . . . . . . . . . . . . . . . . . 45

*Hilliard v. Williams*, 516 F.2d 1344 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Hope v. Pelzer*, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Howard v. City of Durham*, 2021 WL 5086379 (M.D.N.C. Nov. 2, 2021). . . . . . . . . . . . . 37

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) . . . . . . . . . . . . . . . . . 33, 37, 39

*Johnson v. Cheyenne*, 99 F.4th 1206 (10th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) . . . . . . . . . . . . . . . 48, 49

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 8, 23, 24, 27, 32, 34

*Lemons v. Lewis*, 963 F. Supp. 1038 (D. Kan. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Leon v. Fedex Ground Package Sys., Inc.*, 163 F. Supp. 3d 1050 (D.N.M. 2016) . . . . . . 34

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Lopez v. Davis*, 531 U.S. 230 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Margheim v. Buljko*, 855 F.3d 1077 (10th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Martinez v. Turner*, 461 F.2d 261 (10th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*McIntyre v. Unified Gov't of Wynadotte Cnty, et al.*, 2022 WL 2337735
(D. Kan. June 28, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*McPherson v. Baltimore Police Dep't,* 2023 WL 5433011 (D. Md. 2020) . . . . . . . . 41, 42

*Miller v. Pate*, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 27, 28

*Mooney v. Holohan*, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Moses-El v. City and Cnty. of Denver*, 2022 WL 1741944 (10th Cir. May 31, 2022) . . . 47

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Neil v. Biggers*, 409 U.S. 198 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014) . . . . . . . 34

*Pearson v. Callahan*, 555 U.S. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Perry v. New Hampshire*, 56 U.S. 228 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . 29, 33, 39, 40

*Pierson v. Ray*, 386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Polk v. Nugent*, 554 F. App'x 795 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pyle v. Kansas*, 317 U.S. 213 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2002) . . . . . . . . . . . 21

*Richardson v. McKnight*, 521 U.S. 399 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Rios v. Bigler*, 67 F.3d 1543 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) . . . . . . . . . . 50

*Ross v. Blake*, 578 U.S. 632 (2016). . . . . . . . . . 48

*Rubalcava v. City of San Jose*, 2024 WL 2031641 (N.D. Cal. 2024). . . . . . . . . . 37

*Salehpoor v. Shahinpoor*, 358 F.3d 782 (10th Cir. 2004) . . . . . . . . . . 47

*Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101 (10th Cir. 2008) . . . . . . . . 24

*Simmons v. Ward*, 198 F.3d 258 (10th Cir. 1999) . . . . . . . . . . 30

*Smith v. Florida*, 410 F.2d 1349 (5th Cir. 1969) . . . . . . . . . . 39

*Smith v. Sec. of New Mexico Dep't of Corr.*, 50 F.3d 801 (10th Cir. 1995) . . . . . . . . 23, 26

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) . . . . . . . . . . 47

*Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir. 1999) . . . . . . . . . . 34

*Stonecipher v. Valles*, 759 F.3d 1134 (10th Cir. 2014) . . . . . . . . . . 46, 47

*Stovall v. Denno*, 388 U.S. 293 (1967) . . . . . . . . . . 43, 44

*Tarlton v. Sealey*, 2021 WL 1845171 (E.D.N.C. May 7, 2021) . . . . . . . . . . 37

*Thompson v. Clark*, 596 U.S. 36 (2022) . . . . . . . . . . 45

*Tiscareno v. Anderson*, 639 F.3d 1016 (10th Cir. 2011) . . . . . . . . . . 29

*Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021) . . . . . . . . . . 35, 36, 37, 44

*United States v. Alex*, 791 F. Supp. 723 (N.D. Ill. 1992). . . . . . . . . . 32

*United States v. Caraway*, 534 F.3d 1290 (10th Cir. 2008). . . . . . . . . . 34

*United States v. DeVaughn*, 694 F.3d 1141 (10th Cir. 2012). . . . . . . . . . 34

*United States v. Gutierrez de Lopez*, 761 F.3d 1123 (10th Cir. 2014). . . . . . . . . . 34

*United States v. Lanier*, 520 U.S. 259 (1997) . . . . . . . . . . 39

*United States v. Robinson*, 39 F.3d 1115 (10th Cir. 1994) . . . . . . . . . . 32

*United States v. Wade*, 388 U.S. 218 (1967) . . . . . . . . . . 44

*Virgil v. City of Newport*, 545 F. Supp. 3d 444 (E.D. Ky. 2021) . . . . . . . . . . . . . . . . . . . . 28

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Wearry v. Cain*, 577 U.S. 385 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wilson v. Layne*, 526 U.S. 603 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 20

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Statutes**

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Rules**

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Secondary Sources**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*
111 Cal. L. Rev. 201 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

William Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 45 (2018) . . . . . . . . 50

Plaintiff Glynn Simmons spent over 48 years imprisoned for a crime he did not commit. For nearly a half decade, he was separated from loved ones and deprived of the opportunity to enjoy basic freedoms. He lost his entire adult life. His unimaginable suffering was no accident, but rather the result of Defendant Shobert's misconduct. The record evidence would allow a reasonable jury to conclude that Shobert knowingly or recklessly withheld exculpatory information from the prosecutors about who the key eyewitness, Belinda Brown, identified in lineups, and that this information was material because Brown's purported identification was the only evidence against him at his criminal trial. Viewed in the light most favorable to Plaintiff, the evidence also shows that Shobert fabricated evidence claiming that Brown identified Simmons. Shobert's motion for summary judgment is based on viewing the facts in his favor and misunderstandings of the law. Because the law on Plaintiff's constitutional claims has been clearly established since long before 1975 and there is a genuine dispute of material fact on whether Shobert committed constitutional violations, Shobert's motion must be denied.

**RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS ("DSF")**

Admit ¶¶ 2-3, 5-7, 10-12, 31-33, 38, 40.

1. Object that Shobert's military service is immaterial. Otherwise, admit.

4. Object that Shobert's commendations and lack of prior lawsuits is immaterial. Otherwise, admit.

8. Admit first and last sentences. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below; deny. Shobert has no memory of this case,

underlying events, or the investigation of the liquor store robbery and murder of Carolyn Sue Rogers in 1975. Ex. A (Shobert Dep.) at 10, 41, 51, 59.

9. Admit but state that in the January 2, 1975 interview—which was only days after the events—Brown could only give a vague description of the suspects and when asked if she could remember anything else if given more time, she answered, "No, because I thought real hard and I told them when the policemen first came in … if I waited much longer it would get all jumbled up in my mind and it wouldn't be all the same." Ex. 11 at 4-5.

13. Deny in part. Simmons did not regularly hang out with or joyride with the Pattersons. He saw the Pattersons at a party (¶ 12) and went "joyriding" with them once, on February 3, 1975, the day before the party. During this one joyride, they stopped at a Tom's Market, where Simmons stayed in the car while the Pattersons went into the store. Ex. B (Simmons Trial Dep.) at 21-23; Ex. C (Simmons Discovery Dep.) at 109-18.

14. Object that Ex. 20 is inadmissible hearsay; deny. Ex. 20 is not admissible evidence that "[o]n January 30, 1975, an armed robbery was committed at a Tom's Market in Oklahoma City." Ex. 20 is an information *alleging* these facts. Simmons did not commit any armed robbery. Ex. C at 115-19; Ex. B at 22-23; Ex. D (Evid. Hrg. Tr.) at 203.

15. Object that Ex. 21 is inadmissible hearsay; deny. Ex. 21 is not admissible evidence that "another armed robbery was committed at a Tom's Market at 2800 N. Eastern" on January 31, 1975. Ex. 21 is an information *alleging* these facts. Simmons never committed any robberies. Ex. C at 72, 115-19; Ex. B at 22-23.

16. Object that Ex. 22 is inadmissible hearsay; deny. Ex. 22 is not admissible evidence for the statements asserted therein. Ex. 22 is an information *alleging* these facts.

17. Object that the statements asserted in Ex. 23 are inadmissible hearsay; deny. The document is not even signed by Delbert Patterson.

18. Object that the statements asserted in Ex. 24 are inadmissible hearsay; deny. Roberts was not in the company of Patterson at the time of Patterson's arrest. Roberts was arrested when he went to the police station later with his sister Mary (Patterson's wife) to check on Patterson. Ex. E (Roberts Dep). at 67-68. The police told him he was being arrested due to his being a material witness to murder, even though he did not see any murder. *Id.* at 68.

19. Admit in part, deny in part. According to Ex. 25, Simmons was arrested on February 6, 1975 at 7:00 p.m. for an alleged armed robbery, but the specific robbery is not specified in the report. Ex. 25. Simmons believes he was arrested for an alleged robbery at Tom's Market. Ex. B at 22-24. When Simmons was arrested by Oklahoma City police, the officers said it was "for a robbery, but they didn't say what." *Id.* at 25.

20. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below; deny. Shobert approximates 125-150 detectives in the OCPD in 1975; he does not know the number. Ex. A at 17.

21. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below; deny. Shobert has no memory of any events underlying this case or his involvement, Ex. A at 10, 41, 51, 59, and he cannot speculate about what is "possible."

22. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below; deny in part, admit in part. Garrett's report does not say that "Shobert's *first* involvement with the Simmons case was on the morning of February 6, 1975." Ex. 26 (emphasis added). Shobert has no memory of any events underlying this case or his

involvement, Ex. A at 10, 41, 51, 59, but according to Garrett's report, Shobert called Garrett on February 6, 1975, at approximately 9:00 a.m. and stated they [OCPD] had two possible suspects in our Armed Robbery and murder, in custody at the OCPD and that they would like to show them in a line-up to the witnesses in this case." Ex. 26. Admit Simmons alleges the report and the information contained therein was suppressed. Deny that a copy of the report was provided to the County Attorney. ASF ¶¶ 8-10, 15-23, 32-33, 43. Neither Shobert nor any witness knows what the checkboxes at the bottom of Ex. 26 mean, and the assertion that the checkmarks mean that the report was given to the prosecutor is hearsay and speculation. Shobert does not know what those checked boxes mean, he did not check the boxes, and he does not know if the report was given to the district attorney's office. Ex. A at 102-03; Ex. F (Murdock Dep.) at 128-30.

23. Admit that Simmons was not one of the "two possible suspects" in custody on the morning of February 6, 1975. Ex. B at 32-33. Admit that the Pattersons were the "two possible suspects" in the liquor store robbery/murder that were in custody by 9:00 a.m. on February 6, 1975. Deny that Roberts was one of these suspects. Roberts was not in custody at the same time as the Pattersons and was not arrested until later. Ex. E at 65-68, 81-82, 100-01. The exhibit cited (Ex. 25) does not support the first sentence.

24. Deny that the February 10, 1975 lineup report supports that Shobert's "next involvement" in the case was conducting two lineups, on February 7 and 8, 1975. Ex. 26. The report shows that Shobert conducted the lineups on February 7 and 8, but it does not show that that was Shobert's "next involvement" in the case. *Id.* Admit that Shobert filled out a February 8, 1975 Special Showup Report purporting to document that Brown picked

out #2 and #4 in the lineup, who (according to the report) were Simmons and Roberts. Ex. 27; Ex. A at 43-44. Deny that Simmons was in the lineup on February 8, 1975 and that Brown picked him out of that lineup. Ex. D at 204-05; Ex. B at 27, 29-31, 36, 64-66, 70. Object that the substance of the report (i.e., that Simmons was in the lineup in position 2 and Brown picked him out) is inadmissible hearsay. Shobert has no memory of who was in the lineup on February 8, 1975, whether Simmons was in that lineup, and who Brown picked out of the lineup, if anyone. Ex. A at 41, 44-45, 99.

25. Deny that Simmons was in this lineup; otherwise admit. Shobert has no memory of this lineup. Ex. A at 44-47. Delbert Patterson was in position #6. Ex. 27.

26. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below; deny. Shobert had conducted between 25-50 lineups by February 1975. Ex. A at 19. Shobert does not recall this case or what was in the Edmond Police Department file. *Id.* at 99; *see also id.* at 46-47. He does not remember Garrett. *Id.* at 63.

27. Deny that the only evidence that Shobert conducted the lineup on February 7, 1975 is from Garrett's report. Ex. G (Mildfelt Dep.) at 36-38, 109; Ex. C at 147-48. Although Shobert does not remember the lineups, he has no factual basis to question the truth of the February 10, 1975 report. Ex. A at 60-63. Simmons does not recall the name of the officer who brought him to the lineup, but it was an OCPD officer. Ex. 18 at 135. Admit the rest.

28. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below. Admit in part and deny in part. The cited paragraph of Shobert's declaration does not support the fact asserted. Admit that the lineups on February 7 and 8, 1975 did not contain all the same subjects, because Simmons was in the lineup on February

7 but not February 8. Ex. D at 204-05; Ex. B at 27, 29-31, 36. According to the Case Record, Simmons and Roberts were in positions 2 and 4 on February 7, 1975. Ex. 30 at 2 (¶ 4). Admit that Brown testified at the preliminary hearing that there were 8 suspects in the first OCPD lineup (Friday, February 7) and 6 suspects in the second OCPD lineup (Saturday, February 8). Deny that Mildfelt has knowledge of who was in what lineup on which day and who was picked out, if anyone. Ex. G at 37-39, 234-37; Ex. D at 129.

29. Object that Mildfelt and Murdock's cited testimony does not establish that Garrett was the only detective responsible for filling out the Case Record. Shobert does not know who wrote the Case Record. Ex. A at 77. Shobert admitted that the Case Record contains information about what he would testify to, and that he could not think of any way that the author would have known what Shobert would testify to without talking to him. *Id.* at 79-80. Although the Case Record only mentions the February 8, 1975 lineup in Paragraph 5 (the description of Shobert's testimony), Ex. 30 at 2, it repeats what Garrett says in the February 10, 1975 lineup report, which is that Shobert is the OCPD officer who contacted Garrett on February 6, 1975 about conducting a lineup on February 7. *Id.*

30. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below. Admit that Garrett talked to the witnesses after the lineups on February 7 and 8, 1975; deny that Shobert was not present for those conversations. The text of the February 10, 1975 report does not indicate that Shobert was *not* present for the conversation with Brown after the February 7, 1975 lineup or the conversation with the witnesses after the February 8, 1975 lineup. Ex. 26 at 1. The report also states that after the witnesses were dismissed, "RO and Det Shober talked." *Id.* Shobert does not remember whether he had a

discussion with Garrett and Brown after the lineup on February 7, 1975. Ex. A at 101. Moreover, as the officer conducting the lineup on February 7, 1975, Shobert would have known who Brown identified because he would have documented it. *Id.*

34. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below. Admit in part, deny in part. Shobert has no memory of this case, Garrett, or what was in any file. Ex. A at 41, 99. Shobert did not give a copy of his reports to the prosecutor. *Id.* at 67. Shobert does not know if the February 10, 1975 report was given to the district attorney's office. *Id.* at 102-03.

35. Deny in part, admit in part. The cited pages do not say who Brown identified. Admit that Brown was asked to make an in-court identification, and she identified the only possible options—the two Black men (Simmons and Roberts) who were in the courtroom standing trial. Ex. 15 at 182-83; *see also* Ex. H (Franklin Report) at ¶¶ 58, 63, 105 (in-court identifications are highly suggestive, unreliable, and have little to no value).

36. Admit the first sentence. Deny the rest, as it is unsupported by any citation and is merely argument in the guise of facts. The preliminary hearing prosecutor, Dan Murdock, did not have the exculpatory February 10, 1975 lineup report at the time of the preliminary hearing, because the police had withheld it, and neither Simmons nor his counsel could have known what was being withheld from them. ASF ¶¶ 8-10, 15-23, 32-33, 43.

37. Admit that Simmons filed post-conviction petitions in 1997 in state and federal court and that those documents assert that Simmons was not in the February 7, 1975 lineup. Deny that those documents assert that the *prosecutor specifically* was responsible for withholding the exculpatory lineup report. Ex. 35 at 9 (referencing exculpatory evidence

in the possession of "the state," which in the post-conviction context, refers to both the prosecutor and the police, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); Ex. 36 at 12 (same); Ex. I (Elmore Dep.) at 137.

39. Admit that the 1997 petition was denied, but the discussion of materiality in the magistrate judge's Report and Recommendation (R&R) was dicta. The R&R rejected Simmons's argument for ineffective assistance of counsel under *Strickland*, on the basis that the "prosecution would not likely have turned over the investigative police reports" based on a 1973 Oklahoma Court of Criminal Appeals decision about the scope of work product. Dkt. 23-2 at 12. There was no evidentiary hearing on the petition and no testimony from the prosecutors involved about whether they would have turned over the February 10, 1975 lineup report. Ex. I at 134-35. Here, however, Simmons's evidence includes sworn statements from the prosecutors that they would have disclosed the February 10, 1975 lineup report to the defense because it was exculpatory. ASF ¶¶ 15-20.

The R&R's statement in dicta that the February 10 lineup report was not material was based on a different understanding of the contents of the report than what the evidence now shows. The court believed that the Brown identified Simmons but it was only tentative or uncertain. Dkt. 23-2 at 11-12, 14. However, the evidence here is that Brown did not identify Simmons *at all*—not that she merely could not identify him "that well" or that she was "uncertain." Brown did not identify Simmons *at all* on February 8, 1975 because he was not in the lineup on that day, and she did not identify Simmons on February 7, 1975 because she identified the same individuals on both days and he was not in the lineup on February 8 so she could not have identified him on February 7, either. ASF ¶¶ 3-5, 27, 39.

41. Deny that the evidentiary hearing was the "first time" Simmons had ever said he was not in the February 8, 1975 lineup. Not supported by citations. Admit the rest.

42. Admit the first and second sentences. Deny that the documents Defendant refers to is the "DA file" (unsupported by citations), and deny that Robert Mildfelt had the February 10, 1975 lineup report at the time of the criminal trial. Ex. G at 43-45. When John Coyle showed Mildfelt a copy of that report in 2023, Mildfelt said, "Hey, I've never seen that." *Id.* at 44. If Mildfelt had a copy of the exculpatory lineup report, he would have given it to the defense counsel because he had an open file policy. *Id.* at 31-32, 44, 57. Mildfelt does not know where the documents referred to by Defendant as the "DA file" came from, when particular documents were placed into it, or why they look like they have hole punches on them. *Id.* at 63-64, 67-69. Documents (such as the lineup report) were likely placed into a file after the criminal trial, such as during the post-conviction proceedings, when the lineup report was first litigated. *Id.* at 40, 75. *See also* ASF ¶¶ 24-26.

43. Deny that Ex. 41 is the "DA file" as it existed in 1975. Ex. I at 30-32 (post-conviction prosecutor Brant Elmore tried to find original DA file during post-conviction proceedings but it could not be located; the file Elmore gave to Joe Norwood and John Coyle to look at and copy during the post-conviction proceedings was not the original file); Dkt. 89-2 (Castle Aff.) (original 1975 DA file cannot be located); Dkt. 89-3 (Orman Aff.) (same). The handwriting on the copy of the exculpatory lineup report in Ex. 41 is not Mildfelt or Murdock's, and Elmore could not identify it, either. Ex. G at 65-66, 183, 230; Ex. F at 20; Ex. I at 25, 27. According to Elmore, the copy of the lineup report in Ex. 41 (SIMMONS 5762) came from Simmons's post-conviction counsel (Norwood), Ex. I at 22-

23, 32-34, 39-40. Elmore could not say whether SIMMONS 5762-63 was in the possession of the DA's Office in 1975, and he does not recognize the handwriting on SIMMONS 5762. *Id.* at 34-35, 132. Admit the rest.

44. Admit, but Mildfelt also testified that he told Coyle that he had "never seen" the lineup report, Ex. G at 44, and Murdock testified he did not have it at the time of the preliminary hearing, because if he had, it would have been referenced. ASF ¶¶ 15-19.

45. Admit, but Mildfelt was talking about what was on the face of the report; he had no idea that Shobert fabricated the February 8, 1975 Special Showup Report or that Simmons was not in the February 8 lineup, because Shobert never told him. Ex. G at 74, 235-36. If Mildfelt had known that evidence was fabricated, he would have taken that to a "higher source" because that would not have been appropriate. *Id.* at 74-75.

46. Object that Shobert's declaration is inadmissible for the reasons discussed in the Argument below, and this fact is immaterial; admit.

**ADDITIONAL STATEMENT OF MATERIAL FACTS ("ASF")**

1. Simmons and Roberts are innocent of the Edmond liquor store robbery and murder. Ex. B at 10-12; Ex. C at 79, 86-87, 125; Ex. E at 85, 94.

2. Prosecutor Dan Murdock prepared for the preliminary hearing in Simmons's case by reviewing the information on the "blue sheet," also known as the Case Record. Ex. F at 8-10, 16; Ex. 30. The Case Record contained a summary of what the witnesses would testify to, and it was prepared by the detectives who investigated the case. Ex. F at 9-10. The testimony that Murdock expected to elicit from witnesses at the preliminary hearing was based on the Case Record's summary. *Id.* at 10.

3. The Case Record said Belinda Brown would testify that she recognized Simmons and Roberts and picked them out of a lineup on February 8, 1975. Ex. F at 11; Ex. 30 at 1. At the time, Murdock had no information that contradicted this. Ex. F at 11.

4. The Case Record said Garrett would testify that Brown identified Simmons and Roberts as 2 and 4 in the lineup on February 7, 1975. Ex. F at 12-13; Ex. 30 at 2.

5. The Case Record said Shobert would testify that he conducted a lineup on February 8, 1975, and Roberts and Simmons were positions 4 and 2. Ex. F at 13; Ex. 30 at 2.

6. The prosecutor relied on the Case Record in deciding whether to file charges. Ex. G at 232. The decision to charge was only as good as the information the police provided. *Id.* at 233. The decision to charge Simmons was based on the information provided by the officers. *Id.* at 23, 25, 27.

7. Murdock elicited testimony from Brown at the preliminary hearing consistent with what the detectives wrote in the Case Record. Ex. F at 13-14.

8. At the time of the preliminary hearing, Murdock had no idea that there was any information that indicated Brown had identified other people at the lineups. Ex. F at 14.

9. The prosecutor would not know if the information in the Case Record was incorrect or false unless the police told him. The prosecutor relied on the police to give truthful information and would not know if the police suppressed or withheld information unless the prosecutor was told. Ex. G at 232-33.

10. The information that the police gave Mildfelt in 1975 was that Brown had identified Simmons (and Roberts) in lineups. Ex. G at 60, 62-63.

11. Murdock had no involvement in Simmons's criminal case except for the preliminary hearing. Ex. F at 14-15; Ex. J (Murdock Decl.) ¶¶ 1-3.

12. The February 10, 1975 lineup report states that, after the lineup conducted by Shobert on February 7, 1975, Belinda Brown (W2) was asked "if any of the subjects in the lineup were the subjects that shot her," and "she advised, yes #__ is the one that I did not see that well and # 6 was the one that spoke to me 'I think.'" Ex. 26 at 1. The report also states that a "hold" for County was placed on subject #__. *Id.* There is no indication that any hold for county was placed on Simmons. There is no indication in the report that Brown identified Simmons. Ex. 26; Ex. H ¶ 101.

13. According to the February 10th report, Brown called Garrett (RO) at home at approximately 6:30 p.m. on February 7 and said that "the more she thought about it the more subject # 6 in the line-up looked like the one that spoke to her." Ex. 26 at 1.

14. According to the February 10th report, Brown viewed another lineup conducted by Shobert on February 8 and "pikced [*sic*] the same two as she had on 2-7-75." Ex. 26 at 1.

15. According to both prosecutors who handled Simmons's criminal case, Dan Murdock (preliminary hearing) and Robert Mildfelt (trial), the February 10 lineup report was exculpatory and impeaching. Ex. 26; Ex. G at 16; Ex. D at 105, 110-11.

16. The February 10th report indicated that, on February 7, Brown picked "#__" and "#6," which was quite different from what was in the Case Record given to the prosecutors by Garrett and Shobert, which indicated that Brown had identified Roberts and Simmons in position 4 and 2 on February 7. Ex. F at 15-16; Ex. 30 at 2; Ex. B at 38-40.

17. In 1975, Murdock and Mildfelt understood their *Brady* obligation to disclose exculpatory and impeachment evidence to the defense, complied with that obligation at the time, and would have disclosed the lineup report to the defense if they had had a copy of it. Ex. F at 16-17, 130; Ex. J ¶¶ 8-9; Ex. G at 27-28, 44-45, 57; Ex. D at 109-11.

18. Murdock did not have a copy of this lineup report at the time of the preliminary hearing. Ex. F at 8, 17-18, 129-30. There was no mention of the lineup report at the preliminary hearing, and Murdock expected that the defense attorney would have brought it up at the hearing if he had a copy of it. *Id.* at 17-18, 126-28.

19. If the detectives had fabricated the idea that Simmons was in the lineup on February 8, Murdock would not know because they did not tell him about it. Ex. F at 131.

20. The entire case against Simmons revolved around Brown's purported identification; there was no other evidence against him. Ex. D at 113-14; Ex. F at 126. If the prosecutor had information that would have impeached Brown's credibility or called her identification into question, Mildfelt would have disclosed it consistent with his constitutional obligations. Ex. G at 29, 31. The evidence against Simmons was thin, and the exculpatory lineup report made it even more thin. Ex. D at 112-13; *see also id.* at 116-17; Ex. G at 72.

21. Mildfelt could not think of any reason why the defense counsel would not have used an exculpatory report about the identifications. Ex. G at 32; Ex. D at 110-11.

22. Mildfelt had an open file policy, meaning that he allowed defense counsel to view the documents in his file and request copies of police reports in his file. Ex. G at 18; Ex. D at 105, 109-11. He expected that defense counsel would have asked for a copy of the exculpatory lineup report if they saw it. Ex. D at 110-11.

23. Before the evidentiary hearing in 2023 on Simmons's post-conviction petition, Mildfelt had never seen the exculpatory lineup report (EDMOND 44-45). Ex. G at 43-44; Ex. 26; *see also* Ex. D at 105-07. Mildfelt does not think that the lineup report was in his file at the DA's office in 1975. Ex. D at 107-08.

24. Although there were some pages in the collection of documents Bates-stamped SIMMONS 5679-5796 (Ex. 41) that Murdock and Mildfelt recognized, neither of them could identify that collection of documents as the original District Attorney's file or say where it came from. Ex. F at 18-19, 128; Ex. G at 64, 231.

25. There are documents in the "file" that postdate the time of the trial, Ex. E at 19, and it was likely that documents were added to the "file" later, after Simmons's trial. Ex. G at 40-41, 75. Neither Mildfelt nor Murdock could say when the documents in Ex. 41 were placed into the "file." Ex. F at 19, 125; Ex. G at 64, 231.

26. Although there is a copy of the February 10, 1975 lineup report in the collection of documents submitted as Ex. 41, neither Murdock nor Mildfelt could say when that document was placed into the file. Ex. F at 20-21; Ex. J ¶ 7; Ex. G at 67, 230-31. Neither could say that the lineup report was in the possession of the DA's office in 1975. *Id.* Both Murdock and Mildfelt confirmed that the handwriting on that copy of the report was not theirs. *Id.*; Ex. J ¶ 6; Ex. G at 65-66; Ex. F at 126.[1]

[1] The fact that the handwriting on the copy of the lineup report in Ex. 41 is not Mildfelt's or Murdock's shows that they did not have the report at the time they handled the case. It supports the testimony that, even if Ex. 41 is some version of the "DA file," it is not from 1975, and that copy of the report was likely placed into the file during the 1997 habeas proceedings.

27. Given that Brown picked out the "same two" suspects from the lineup on February 8 as she had on February 7, and Simmons was not in the lineup on February 8, Brown could not have picked him out on February 7. Ex. B at 36-37; Ex. 26 at 1. *See also* Ex. R (Scott Supp. Report) ¶ 2; Ex. 30; Ex. C at 159-60.

28. Even if Simmons's current memory was faulty and the jury credited his statements from 1997 that he was not in the lineup on February 7, 1975 but was in the lineup February 8, Brown still could not have picked him out, because she picked out the same two suspects on both days, and Simmons was not in the lineup on February 7. Ex. 26 at 1; Ex. 30 at 1-2; ASF ¶¶ 3-5. Either way, the February 10, 1975 lineup report is exculpatory and Brown's purported identification of Simmons in the February 8 1975 Special Showup Report was fabricated by Shobert.

29. In 1975, Shobert knew and understood that he had an obligation to communicate information learned from witnesses to prosecutors, including by taking all copies of reports to the district attorney's office. Ex. A at 37.

30. Leonard Patterson was the murder suspect whose apartment was searched and felt hats were located and confiscated. Ex. 32.

31. Brown testified at the preliminary hearing that she identified the two defendants at the hearing (Simmons and Roberts) on February 7 and 8, 1975, but that there were two other individuals she identified before that. Ex. K (Prelim. Hrg. Tr.) at 57.

32. Simmons did not receive a copy of the February 10 lineup report at the time of trial; his attorney would have used it if he had it. Ex. B at 40-41.

33. Roberts did not receive a copy of the February 10 lineup report at the time of trial; his attorney would have used it if he had it. Ex. E at 131-32.

34. Simmons and Roberts were tried together. *See* Ex. G at 16. It was never mentioned at the trial that Belinda Brown identified # 6 and #__. Ex. B at 40; *see* Ex. L (Trial Tr.).

35. The State's case against Simmons at trial was Brown's testimony. Ex. B at 40; *see* Ex. L. Brown testified that Roberts was the man who spoke to her, and the other man (Simmons) did not speak to her. Ex. L at 182-84.[2] Brown claimed to have identified "Don Simmons, the Defendant in the green sweater" in a lineup on "Friday, on February 8," with either six or eight people. *Id.* at 198-99.[3] Brown testified that she identified Simmons on "Friday, February 8, and Saturday, February 9." *Id.* at 205.

36. No other witnesses (including Norma Hankins, the store clerk who survived, and Johnny Delbrel, another purported witness) identified Simmons at trial or picked him out of a lineup. Ex. L at 170-71, 173, 175, 179-80, 211-12. Hankins' non-identification of Simmons is strong evidence of his innocence, given that she had a better opportunity to view that perpetrator than Brown. Ex. H ¶¶ 106-07.

37. There was no physical evidence, hair evidence, fingerprints, blood, or gun presented against Simmons. Per Mildfelt, "it was an ID case. There was nothing else. … the strength of the case, if there was a strength, was the ID … it stood or failed on that, the whole case." Ex. D at 114; *see also id.* at 116-17. *See generally* Ex. L; *id.* at 263-64.

---

[2] These are citations to the original pagination of the transcript.

[3] February 7, 1975 was a Friday; February 8, 1975 was a Saturday, so it is unclear which day Brown was referring to.

38. At the criminal trial, Simmons testified in his own defense and presented several alibi witnesses, but to no avail. *See* Ex. L at 289-307, 316-52.

39. Shobert's February 8, 1975 Special Showup Report (Ex. 27) is fabricated because Simmons was not in the lineup on February 8, 1975, and Brown could not have picked him out. Ex. C at 62, 65, 70, 130; Ex. B at 30-31, 36-37. Simmons recalls being in one lineup, which occurred the day after his arrest on February 6, 1975. Ex. C at 64-66, 131-32, 140; Ex. B at 27, 29. He recalls because he spent the night in a cell with the Patterson brothers and he was placed in a lineup the next day. Ex. C at 64; Ex. B at 26-27.

40. Simmons ended up in the lineup on February 7, 1975 because the officers needed more participants in the lineup. Ex. B at 33.

41. Simmons was not identified in the robbery he had been arrested for. Ex. B at 33.

42. The officers took another mugshot of Simmons before trial; this photo was shown to Brown so that the officers could remind her who to pick out at trial. Ex. B at 46-48.

43. In the 2023 post-conviction proceeding, the State confessed error, admitted a *Brady* violation, agreed to the grant of a new trial, and agreed to dismiss the criminal charges against Simmons. Ex. B at 86; Ex. D at 8, 15, 20, 22; Ex. I at 138-39; Ex. M (Notice). The state court vacated Plaintiff's conviction on the ground that the February 10, 1975 lineup report was withheld in violation of *Brady*. Ex. O (Amd. Order Granting Post-Conviction Relief) at 5. The charges against Plaintiff were dismissed, and he was declared actually innocent. Ex. P (Order Dismissing with Prejudice); Ex. 38.

44. If Shobert withheld the exculpatory evidence in the February 10, 1975 lineup report and fabricated the Showup Report stating that Brown had identified Simmons, those

actions did not comport with well-established police practices and procedures in 1975. Ex. Q (Scott Report) at 7 (Opinion 1), ¶¶ 1.11, 1.13, 1.14; Ex. R (Scott Supp. Report) ¶ 3.

45. The lineups presented to Brown and other witnesses by Shobert were flawed and inconsistent with well-established lineup procedures for law enforcement in 1975. Ex. Q at 12 (Opinion 2), ¶¶ 2.1-2.7.

46. Specifically, assuming that Simmons was in fact in the lineup on February 8, 1975, he was far different in height from other individuals in the same lineup, such as Delbert and Leonard Patterson. Simmons was 5'7"; the Pattersons were 6'1" and 6'2". Ex. Q ¶ 2.6. The physical lineups conducted by Shobert were inconsistent with well-established police practices and procedures for the following reasons: 1) Brown sustained a severe gunshot wound to her head during the robbery and claimed she was unable to see anything for at least three minutes after being shot. Such individuals would have suffered some type of damage to their memory capability; 2) Brown was shown at least 8-9 lineups (referred to by the OCPD as "showups"), which can cause a witness to be confused and suffer from fatigue; 3) Brown and two other witnesses were present at the showups together, which can contaminate the identification process and render it unreliable; 4) the height of the Patterson brothers was far taller than Simmons and the other witnesses, which forced the witnesses to focus on the remaining four suspects given their height; 5) Roberts and Simmons were placed in one showup together, which increases the odds that the wrong suspect or suspects may be selected; 6) the Patterson brothers should have been placed in a separate showup with others of similar height and weight; 7) Shobert failed to document and account for every lineup presented to witnesses; 8) there was no evidence that any

admonishments were given to witnesses advising that the suspect may or may not be in the showup; and 9) during the multiple showups, Brown selected other subjects based on their facial features, which was not memorialized by Shobert.

47. Even assuming that Brown identified Simmons in any lineups, those identifications were highly unreliable. Ex. H ¶ 5. In this case, there were many observational and physical factors shown by research to undermine perception of and memory for strangers' facts, thereby diminishing the evidentiary value of any eyewitness identification that followed. *Id.* These factors included high error rates associated with stranger identification, limited opportunity to view, divided attention, partial disguise, increased risk of misidentification due to cross-race identification, Brown being on pain medication, a delay in when the identification procedures were conducted, composite sketches which were harmful to memory, non-blind administration of the lineups, multiple suspects in a single lineup and poor filler quality, clothing bias and suggestive showup of an object, and co-witness contamination. *Id.* ¶¶ 20, 22-63, 72-100, 108-09.

48. Moreover, the descriptions of the men that Brown provided after recovering from her traumatic brain injury, as well as her supposed identification of Simmons, was very likely influenced by her exposure to multiple forms of post-event suggestion. Ex. H ¶ 5.

49. Even if Brown identified Simmons on February 8, 1975, such an identification of him was trumped by the absence of a clear identification the previous day. Ex. H ¶ 104.

**ARGUMENT**

On a motion for summary judgment, the court "review[s] the facts and all reasonable inferences those facts support[] in the light most favorable to the nonmoving party." *Doe*

*v. Univ. of Denver*, 952 F3d 1182, 1189 (10th Cir. 2020). "[T]he judge's function is not … to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is material if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).

**I. Shobert's Sham Declaration Is Inadmissible**

Shobert was deposed on September 13, 2024. Ex. A. He testified that he did not remember anything about this case, the investigation, or Garrett. *Id.* at 10, 41, 51, 59, 99. He testified that he had prepared for the deposition by meeting with his counsel twice for several hours and reviewing documents, but none of this refreshed his recollection. *Id.* at 7-10, 42-43. Shobert said "I don't remember" or some variation of it approximately *90 times* in his deposition. *See id.* Now realizing that recalling nothing makes it hard for him to offer his version of events, Shobert has submitted a long declaration asserting facts that he did not remember at his deposition, and otherwise acting as a fake factual conduit for his counsel's speculation and legal theories. This declaration is patently inadmissible.

First, most of the declaration is not based on personal knowledge, as required by Rule 56(e) and Rule 602. Fed. R. Civ. P. 56(e) ("[s]upporting and opposing affidavits shall be made on personal knowledge,"); Fed. R. Evid. 602 (testifying witnesses must "ha[ve] personal knowledge of the matter."). Under the personal knowledge standard, an affidavit is inadmissible if "the witness could not have actually perceived or observed that which he testifies to." *Argo v. BCBS of Kansas, inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (cleaned up). Thus, "at the summary judgment stage, 'statements of mere belief' in an affidavit must

be disregarded." *Id.* Shobert repeatedly refers to documents of which he has no knowledge and asserts the truth of the facts contained within those documents as if he had personal firsthand knowledge of those facts. *See, e.g.*, Ex. 1 ¶¶ 6-7. Shobert also regurgitates facts from the police reports as if he recalls those facts as being true, *id.* ¶¶ 8-10, but as he admits in the declaration (and as he repeatedly testified at his deposition), he has no memory whatsoever of this case, *id.* ¶ 10, Ex. A at 10, 41, 51, 59, 99. Shobert asserts that certain things are "possible" or "conceivable," Ex. 1 ¶¶ 10-12, that reports "seem to indicate" certain facts, *id.* ¶ 18, that it is "reasonable to conclude" certain things, *id.* ¶ 22, and that he "assumes" certain facts, *id.* ¶ 24. In other paragraphs, Shobert asserts his conclusions about facts based on his (or truly, his counsel's) reading of police reports, none of which he actually remembers in this case. Because Shobert testified at his deposition that he had no memory of *any* of the underlying events or the investigation, he has no personal, firsthand knowledge of any of these facts, either. *See* Ex. 1 ¶¶ 9-14, 16, 18, 21-24, 26.

Second, several of Shobert's assertions in the declaration contradict his sworn deposition—where he testified repeatedly that he did not remember any facts of this case. *Compare* Ex. A at 17 *with* Ex. 1 ¶ 5; *compare* Ex. A at 41, 46-47, 59-60 *with* Ex. 1 ¶¶ 8, 10-13, 21-25; *compare* Ex. A at 101 *with* Ex. 1 ¶ 14; *compare* Ex. A at 20, 46, 48 *with* Ex. 1 ¶ 18; *compare* Ex. A at 102 *with* Ex. 1 ¶ 28. This court should disregard contradictory testimony when it "constitutes an attempt to create a sham fact issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973-74 (10th Cir. 2002) (cleaned up). Although the "sham affidavit" issue usually arises in the context of a non-movant submitting an affidavit at summary judgment that contradicts their deposition, the principle is equally applicable

here, where Shobert is trying to create facts that support his motion after realizing that his own deposition testimony is unhelpful to him. To determine whether a contradicting declaration seeks to create a sham fact issue, courts look to three factors, whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995).

These three factors are easily met here. First, Shobert was cross-examined extensively at his deposition. He was asked about his memory of the case generally, the investigation, Garrett, Simmons, the lineups, and specific reports. Other than identifying his handwriting on the Special Showup Report, Shobert remembered nothing. Ex. A at 30, 41, 44-48, 51, 58, 60-63, 65, 71-72, 75-77, 79-82, 85-87, 91-92, 97-100. Moreover, Shobert submitted interrogatory responses under oath which stated that he remembers nothing about this case. Ex. N (Shobert Resp. to First Set of Ints.) at Resp. to Ints. 4, 6, 9-12, 15, 17. Second, at the time of his deposition, Shobert had access to the documents he discusses in his new declaration. He spent several hours preparing for his deposition, and he was shown documents, including documents discussed in his declaration. Ex. A at 8-10, 43, 58, 74, 77, 81-83. Third, Shobert's deposition does not reflect any "confusion" which his declaration now attempts to explain.

## II. A Trial Is Required on Plaintiff's *Brady* Claim

To establish his claim under *Brady v. Maryland*, 373 U.S. 83 (1963), Plaintiff must show "1) that the prosecution suppressed evidence; 2) that the evidence was favorable to

the accused; and 3) that the evidence was material." *Smith v. Sec. of New Mexico Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995); *McIntyre v. Unified Gov't of Wynadotte Cnty, et al.*, 2022 WL 2337735, at *7 (D. Kan. June 28, 2022). "For purposes of *Brady*, '[k]nowledge by police or investigators is … imputed to the prosecution.'" *Id.*; *Kyles*, 514 U.S. at 438. The disclosure obligation includes impeachment evidence. *Giglio v. United States*, 405 U.S. 150 (1972). Finally, *Brady* requires that the suppressed evidence "might have affected the outcome of the trial." *Smith*, 50 F.3d at 826; *see also Kyles*, 514 U.S. at 435 ("the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). To determine materiality, the suppressed evidence must be viewed in relation to the record as a whole. *Id.* at 827. "[W]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Id.* When multiple pieces of information or evidence are at issue, the question of materiality must be considered cumulatively, rather than with each piece in isolation. *Wearry v. Cain*, 577 U.S. 385, 394 (2016).[4] Shobert is not entitled to qualified immunity, for the reasons discussed below.

### A. The Information in the February 10, 1975 Report Was Exculpatory and Shobert Deliberately, Knowingly, or Recklessly Withheld It

Shobert misunderstands Plaintiff's argument and the facts supporting the *Brady* claim. Br. at 17. Plaintiff does not allege that the February 8, 1975 Special Showup Report

[4] Throughout his argument, Shobert cites facts which do not correspond with or are different from the facts he places in his Statement of Facts. *See* Br. This is contrary to LCvR 56.1(b), (d). Plaintiff has responded to Shobert's paragraphs of fact and set forth additional facts creating a genuine dispute of material fact as required by LCvR 56.1(c), and in the Argument section, cited to the relevant paragraphs of facts or exhibits where appropriate.

written by Shobert was exculpatory—it was *inculpatory* because it stated that Brown picked out Simmons in the lineup on February 8, 1975, but this was fabricated as discussed in Argument III, below. A reasonable jury could find two types of exculpatory evidence that Shobert suppressed: (1) Shobert's suppression of the fact that he fabricated the "results" of the February 8, 1975 lineup in the Special Showup Report, and (2) Shobert's suppression of the fact that Brown had identified two other individuals who were not Simmons in the February 7 and 8, 1975 lineups, which is shown in the February 10, 1975 lineup report. Resp. to DSF ¶¶ 22, 24, 28, 30, 44, 45; ASF ¶¶ 3, 8-10, 15-23, 27-28, 32-34; *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017) (fabrication of evidence constituted impeachment evidence that was suppressed); *Kyles*, 514 U.S. at 445 ("Damage to the prosecution's case would not have been confined to evidence of the eyewitnesses, for Beanie's various statements would have raised opportunities to attack … the thoroughness and even the good faith of the investigation.").

Shobert does not contest that the February 10, 1975 lineup report (or the information contained therein) was exculpatory and impeaching.[5] And obviously this information was exculpatory and impeaching, because it was evidence that Brown identified other individuals who were not Simmons in the lineups. Whether or not Shobert assisted Garrett

[5] Any argument to the contrary has been waived and cannot be raised for the first time in reply. *See, e.g.*, *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1104 n.3 (10th Cir. 2008) (inadequate briefing waives argument). Moreover, both prosecutors agreed that it was exculpatory and impeaching. ASF ¶¶ 15, 17, 20. The State of Oklahoma conceded that the report was exculpatory. ASF ¶ 43. The state court that granted Simmons post-conviction relief found that it was exculpatory and impeaching. *Id.*

in writing the February 10, 1975 lineup report is *irrelevant*, although there is certainly enough evidence for a reasonable jury to conclude that they created that report together because they conducted the lineups and interviews of witnesses regarding the lineups together. Resp. to DSF ¶ 30; Ex. 26. The important fact is that *Shobert knew Brown did not identify Simmons in the lineups*—it is this exculpatory information that Shobert withheld from prosecutors. On February 7, 1975, Brown identified #6 as the one who spoke to her and #__ as the one she did not see that well. ASF ¶ 12. According to the Case Record, Simmons was in position #2 on February 7, 1975, not position #6 or #__. ASF ¶¶ 4, 16. Also, Simmons was not present in the lineup on February 8, 1975, and so if Brown identified the "same two" on February 8 as February 7, then she did not identify Simmons on either day, regardless of what position he was in during the lineup on February 7. ASF ¶¶ 14, 27. (The Case Record also states that Brown picked out the same two individuals, who were in positions 2 and 4, in both lineups. ASF ¶¶ 3-5.) And, of course, since Simmons wasn't in the lineup on February 8, Brown couldn't have picked him out on February 8, 1975. ASF ¶ 39; Resp. to DSF ¶ 24. Because Shobert conducted the lineups, he knew who was and was not in the lineups, and he knew who the witnesses picked out (if anyone) because he documented that information for both lineups. Resp. to DSF ¶¶ 24, 27, 30.

Shobert argues that Simmons previously mixed up the date that he was not in the lineup and said in his 1997 habeas proceedings that it was February 7, not February 8, 1975. DSF ¶¶ 37-38. Simmons's present memory (and his memory at the time of the post-conviction evidentiary hearing in 2023, before he filed this lawsuit) is that he was not in the lineup on February 8, 1975, but he was on February 7, because he recalls being placed

in only one lineup the day after his arrest, on February 6. Which version is true is for a jury to determine, and at this stage, the Court's only task is to determine if there's a genuine dispute of material fact on Plaintiff's *Brady* claim, and there clearly is. The court must view the facts in the light most favorable to Simmons, which is that he was not in the lineup on February 8, 1975. If Defendants want to cross-examine him on this at trial, they can, but the Court cannot decide which version is true at summary judgment. And, assuming that a jury credits Simmons's prior statements that he was not in the lineup on February 7 (as opposed to February 8), the result is the same: if Simmons was not in the lineup on February 7, 1975 and Brown identified the "same two" suspects on both days, then she did not identify Simmons on February 7 or 8, 1975.

Police officers are required to disclose all exculpatory and impeachment information that they are aware of to prosecutors, and that includes facts that they know (e.g., Brown did not identify Simmons), whether or not it is memorialized in the form of a report.[6] *Giles v. State of Maryland*, 386 U.S. 66, 74-81 (1967) (officers were constitutionally obligated to disclose exculpatory evidence that called into question the alleged victim's credibility, including what she told the police); *Smith*, 50 F.3d at 831 (holding that information a police officer had regarding the identity of an alternative suspect and was not disclosed to the criminal defendant was imputed to the prosecution under *Brady*); *Castleberry v. Crisp*, 414 F. Supp. 945, 953 (N.D. Okla. 1976); *Fontenot v. Crow*, 4 F.4th 982, 1063 (10th Cir. 2021); *see also id.* at 1061 ("Evidence suppressed by

[6] Plaintiff does not argue that Shobert had a duty to disclose information directly to the defense, so that argument of Shobert's can be disregarded. Br. at 19-20.

the state includes 'evidence known only to police investigators and not to the prosecutor.'") (quoting *Kyles*, 514 U.S. at 438); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846-47 (4th Cir. 1964) (holding that an officer's failure to disclose exculpatory evidence to a prosecutor violates a defendant's due process rights); *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019) ("While most commonly viewed as a prosecutor's duty to disclose to the defense, it is settled that the duty imposed by *Brady* extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor.") (cleaned up); *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (similar); *Kyles*, 514 U.S. at 441-44 (the purported identifications by witnesses "would have been severely undermined by use of their suppressed statements"); *Grayson v. City of Aurora*, 157 F. Sup. 3d 725, 739-40 (N.D. Ill. 2016) (denying defendants' motion for summary judgment on plaintiff's *Brady* claim involving information a witness told police officers, which was never mentioned or disclosed on any police report).

Shobert argues that Plaintiff "tries to shift liability to Shobert for the contents of the report" but because his name is misspelled in the report, that means he did not write it with Garrett. Br. at 17. This views the facts in his favor, contrary to the summary judgment standard, but it also misunderstands Plaintiff's position. What a reasonable jury could find Shobert liable for is that he failed to disclose the exculpatory information as reflected in the report to the prosecutors. It is not about whether Shobert wrote the report with Garrett or assisted Garrett in writing the report. It is about Shobert's *knowledge that he gained from conducting the lineups on February 7 and 8, 1975 that Brown identified other individuals and not Simmons*, and his subsequent withholding of that exculpatory information.

Shobert argues that he had no responsibility to disclose the exculpatory information to the prosecutor because he thought Garrett would do it by giving the lineup report to the prosecutor. Br. at 20-21. This argument is not supported by either law or facts. First, Shobert has cited no caselaw in support of his theory that an officer has no personal obligation to disclose exculpatory information that he knows to the prosecutor. This is forfeiture. And, the law is to the contrary. *Moldowan*, 578 F.3d at 379; *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 460 (E.D. Ky. 2021).

Second, the facts are in dispute.[7] As discussed above, Shobert disclaimed any memory *of anything that happened in this case*, including any conversations with Garrett, the lineups, or the lineup report. Given his lack of memory, there is no factual basis for Shobert to assert that he thought Garrett would give the exculpatory information to the prosecutor. Moreover, the fact that Shobert fabricated Brown's purported identification of Simmons in the February 8, 1975 lineup (as reflected in his Special Showup Report), supports the idea that Shobert knowingly, deliberately, or recklessly withheld the exculpatory information from the prosecutor. There is no evidence for Shobert's argument that "he had reason to believe the district attorney's office had received all relevant reports from Detective Garrett." Br. at 21. Shobert has no idea whether the report was given to the

[7] Shobert cites his expert Wallentine's deposition testimony (Br. at 21), but Wallentine's opinions are not based on testimony from Shobert about what Shobert did or did not do or thought Garrett would do because Shobert did not recall anything. Moreover, Wallentine's opinions are disputed by Plaintiff's expert, Andrew Scott. *See* Ex. S (Scott Dep.) at 146; Ex. Q at 7 (Opinion 1), ¶¶ 1.3, 1.5, 1.11.

prosecutor's office. Resp. to DSF ¶¶ 22, 34. He does not know what was in Garrett's file and thus cannot say that he thought Garrett disclosed the report. *See* Resp. to DSF ¶ 26.

Shobert asserts that *Kyles* held that prosecutors have the ultimate duty to disclose, including information that is known only to the police. Br. at 19. That is true, in the criminal context, but for the purposes of a civil case, where a police officer is alleged to have withheld exculpatory information from the prosecutor, there is undisputedly a constitutional obligation on the part of the *police* to disclose to the prosecutor. *See cases cited supra.* Shobert takes language from *Kyles* completely out of context.[8]

Furthermore, a reasonable jury could conclude that Shobert acted deliberately, knowingly, or recklessly because he knew about Brown's identification of *other individuals* and failure to identify Simmons and yet, he did not disclose it to the prosecutor. Resp. to DSF ¶¶ 25, 28; ASF ¶¶ 12-14, 16, 27-28, 31, 39. Shobert does not address this. Br. 18-19. *Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004); *Johnson v. Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024). Contrary to Shobert's assertion otherwise, Br. at 18-19, Plaintiff does not argue that Shobert acted only negligently.

### B. A Reasonable Jury Could Find the Information in the February 10, 1975 Lineup Report Was Material

Shobert argues that the information in the February 10, 1975 lineup report was not material because the court so ruled in Plaintiff's 1997 federal habeas petition, which was

[8] Shobert has not argued that it was not clearly established until *Kyles* that police officers were required to disclose exculpatory evidence to the police. Br. at 19. Any such argument is forfeited and cannot be raised for the first time in reply.

affirmed by the Tenth Circuit. Br. at 18.[9] Shobert does not argue that the habeas decisions have any preclusive effect but only that they have precedential value.[10] *Id.* For several reasons, this argument has no merit.

First, the Tenth Circuit opinion (Dkt. 23-4) contains no discussion of materiality. The Tenth Circuit denied Simmons's request for a certificate of appealability (which is an entirely different standard of review than the one before the Court here on his §1983 claims) and dismissed his appeal, stating that the "district court's analysis of this case is correct and that appellant has not made a substantial showing of the denial of a constitutional right." *Simmons v. Ward*, 198 F.3d 258, *1 (10th Cir. 1999) (unpublished). The district court "concluded that [Simmons] had not shown cause for his failure to raise the *Brady* issues on direct appeal and that those issues were procedurally barred." *Id.* There was no consideration of materiality by the Tenth Circuit—indeed, the *Brady* factors are not even mentioned—and there is therefore no value to the Tenth Circuit's denial of the certificate of appealability. The court decided that appeal on an entirely different question.

Second, the district court's decision affirming the magistrate judge's R&R also contains nothing of precedential or persuasive value. It simply states its agreement with the R&R, with no analysis or discussion. Dkt. 23-3.

[9] Shobert mentions "two reports" that were "at issue" in the 1997 habeas proceedings. Only the exculpatory lineup report is relevant here; the second report discussed in the R&R is irrelevant here because it is not the basis of Plaintiff's claims. *See* Dkt. 23-2 at 15.

[10] Defendant has thus waived any argument that the habeas decisions could have any preclusive effect.

Third, the R&R (Dkt. 23-2) does not have precedential or persuasive value. The state court which granted Plaintiff's post-conviction claims in 2023 knew that this prior decision existed and still reached a diametrically opposite result. ASF ¶ 43. That is because the state post-conviction court had a different record with different evidence than what was presented to the federal courts in the 1997 habeas proceeding. The R&R was issued after consideration of "the state court record of the trial and court proceedings," *without* an "evidentiary hearing." Dkt. 23-2 at 1; Resp. to DSF ¶ 39. The R&R recounted that at Plaintiff's trial, Brown "testified she had never identified anyone other than the defendants [Simmons and Roberts] in the lineups." Dkt. 23-2 at 2. The R&R continued, "Petitioner alleges that this report is evidence that Brown was uncertain about the identity of the suspects she had identified and that Brown may not even had identified petitioner on February 7, 1975, since she testified she first identified him on February 8, 1975." *Id.* at 12. In other words, the record before the court at that time did not show that Brown *never identified Plaintiff at all during any lineup.* That is what the record now shows. Resp. to DSF ¶¶ 25, 28; ASF ¶¶ 12-14, 16, 27-28, 31, 39. Nor did the 1997 record contain evidence that Brown's identification of Plaintiff was fabricated by Shobert, which we now have. Resp. to DSF ¶¶ 24-25; ASF ¶¶ 3, 5, 27-28, 39. In fact, the R&R assumes that Brown identified Plaintiff, even if her identification was tentative. *Id.* at 14-15.

Here, the record would allow a reasonable jury to conclude that Simmons was not in the February 8, 1975 lineup; that Shobert's report stating that Simmons was in the February 8 lineup and Brown identified him was fabricated; and that Brown identified the same two on February 7 and 8, which means that she did not identify Simmons on either

day, since he was not in the lineup on February 8. Resp. to DSF ¶¶ 24-25, 28; ASF ¶¶ 3-5, 12-14, 16, 27-28, 31, 39. Moreover, the record now includes evidence from the prosecutors that February 10, 1975 lineup report was exculpatory and impeaching, they did not have it, and if they had it, they would have disclosed it to the defense. Resp. to DSF ¶¶ 22, 24, 28, 30, 44, 45; ASF ¶¶ 3, 8-10, 15-23, 27-28, 32-34. And finally, the record includes evidence that Brown's purported identification was the entire case against Simmons. ASF ¶¶ 35-38. *See Kyles*, 514 U.S. at 441 (where "'essence of the State's case'" was the testimony of eyewitnesses, disclosure of their conflicting statements would have "substantially reduced or destroyed" the value of their testimony); *Bowen v. Maynard*, 799 F.2d 593, 610-11 (10th Cir. 1986) (evidence impeaching witnesses was material where the witnesses were the "heart of the State's case"); *United States v. Robinson*, 39 F.3d 1115, 1116-19 (10th Cir. 1994) (fact that witness provided description of person who did not match defendant was material where the evidence against defendant at trial "was hardly overwhelming" and the omitted information would have "substantially weaken[ed]" the case against the defendant'); *United States v. Alex*, 791 F. Supp. 723, 730 (N.D. Ill. 1992) (impeachment evidence is material if it tends to undermine the credibility of an important government witness). The reason that the R&R found (in dicta) that the report was not material was because it had a different understanding of what that report showed, based on the record then-available in that case. Resp. to DSF ¶ 39. Here, a reasonable jury could conclude differently, based on the record evidence now available.

Finally, Shobert's reliance on language from *Wilson v. Layne*, 526 U.S. 603, 618 (1999), and *Pearson v. Callahan*, 555 U.S. 223, 245 (2009), is misplaced. In those cases,

the Supreme Court held that Circuit splits on the relevant constitutional question meant that officers should not be subject to money damages because the law was not clearly established. That is simply not the case here. As discussed below, the law has been clearly established since long before 1975 that police officers must disclose exculpatory and impeachment evidence to prosecutors, and any reasonable officer in Shobert's position would have known that his conduct did not comply with the law. It is a *jury question* whether the February 10, 1975 lineup report was *material*. Materiality does not affect Shobert's disclosure obligations—his only obligation was to disclose any exculpatory or impeachment evidence to the prosecutor.

As to whether the law was clearly established in 1975 that police officers had a constitutional obligation to disclose exculpatory and impeachment evidence (including exculpatory or impeaching statements of witnesses) to prosecutors, the answer is clearly yes. The Court already so held. Dkt. 39 at 5 (citing *Giles* and *Pierce*); *Pierce*, 359 F.3d at 1299 ("Long before the events in question [in 1986], the Supreme Court held that a defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction, [citing *Pyle*], or withholds exculpatory evidence from the defense, [citing *Brady*]."); *Giles*, 386 U.S. at 74-81; *Bledsoe v. Carreno*, 53 F.4th 589, 613 (10th Cir. 2022); *Jackson v. City of Cleveland*, 925 F.3d 793, 823-824 (6th Cir. 2019) (clearly established by at least 1975); *Barbee*, 331 F.2d at 846; *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (clearly established by 1971); *Hilliard v. Williams*, 516 F.2d 1344, 1349 (6th Cir. 1975) (police violated *Brady* obligation by withholding exculpatory report); *Brady*, 373 U.S. at 86-87; *Giglio*, 405 U.S. at 153-54; *Bowen*, 799 F.2d

at 610; *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396, 398-402 (4th Cir. 2014); *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001); *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988); *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1219-23 (9th Cir. 2015); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996).[11]

Shobert asserts, without argument, that the February 10, 1975 lineup report is hearsay. Br. at 25, 39. The failure to develop this argument is waiver. *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1137 n.16 (10th Cir. 2014) (undeveloped arguments are waived); *United States v. DeVaughn*, 694 F.3d 1141, 1154-55, 1154 n.9, 1158 (10th Cir. 2012) (perfunctory arguments waived or forfeited). Even if this argument were not waived, the report could have been used to impeach Brown or Garrett (both of whom testified at trial). *See Kyles*, 514 U.S. at 441-49 (conflicting statements of witness could have been used to cross-examine the witness and the police, including "attacking the reliability of the investigation"); *Leon v. Fedex Ground Package Sys., Inc.*, 163 F. Supp. 3d 1050, 1061 (D.N.M. 2016) (statement that is otherwise hearsay may nevertheless be used to impeach); *United States v. Caraway*, 534 F.3d 1290, 1295 (10th Cir. 2008) (evidence of a prior inconsistent statement may be used to impeach).[12]

---

[11] Some of these cases involve police actions after 1975. But the point is that they primarily rely on *Brady* (and *Giglio*), decided in 1963 and 1971, for the proposition that police officers were constitutionally obligated to disclose exculpatory and impeachment evidence.

[12] The two out-of-Circuit cases Shobert cites on p. 20 are inapposite. In *Kelly v. Curtis*, 21 F.3d 1544, 1552 (11th Cir. 1994), the officer had reason to believe the exculpatory lab reports were known to the prosecutor's office. The officer did not have reason to know that the prosecutor's office did not get the evidence until months later. Here, the evidence

### III. A Trial Is Required on Plaintiff's Fabrication of Evidence Claim

To show that Defendant's fabrication of evidence constituted a constitutional violation, Plaintiff must show that "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021). Shobert only contests elements 2 and 3. Element 4 is undisputed. DSF ¶ 40; ASF ¶ 42. There is a genuine dispute of material fact on element 1, whether Shobert knowingly fabricated evidence. Plaintiff was not in the lineup on February 8, 1975, yet Shobert's February 8, 1975 Special Showup Report states that Simmons was in the lineup and Brown picked him out, Resp. to DSF ¶¶ 24; ASF ¶¶ 3, 5, 39.[13] A reasonable jury could find that these statements in the February 8, 1975 Special Showup Report—that Brown picked Simmons out of position 2 in the lineup—were knowingly fabricated by Shobert because Shobert conducted the lineup and knew that Simmons was not in it. "Although there is some disagreement … over what degree of intent the officer must have, he necessarily must

---

viewed favorably to Plaintiff shows that the prosecutors never received the February 10, 1975 lineup report or any of the information contained in it. *Polk v. Nugent*, 554 F. App'x 795, 799 (11th Cir. 2014), is unpublished and distinguishable. It merely stands for the idea that negligence is not sufficient to support a *Brady* claim.

[13] Shobert argues that Plaintiff's complaint asserts that he was in the lineup on both days; *see* Br. at 3. Obviously this was a mistake on counsel's part, but a mistake of Plaintiff himself, because he testified in both the 2023 evidentiary hearing and in his 2024 deposition that he was only in one lineup, on February 8, 1975. If Defendant wants to cross-examine Plaintiff on this at trial, they can. Credibility determinations cannot be made by the Court at summary judgment.

possess knowledge of the evidence's falsity." *Truman*, 1 F.4th at 1236 (cleaned up and citation omitted). Here, Shobert knew that the evidence (the assertion that Brown picked out Simmons) was false because he conducted the lineup and wrote the report.

A reasonable jury could also find that Shobert knowingly fabricated evidence in the Case Record, which was prepared by the detectives in the case. Even if the Case Record was written by Garrett because he was the lead detective (*see* DSF ¶ 29), it contained information about what Shobert would testify to regarding who was in the lineup on February 8, 1975 (ASF ¶ 5) and who Belinda Brown supposedly picked out (ASF ¶ 3). A reasonable jury could conclude Shobert communicated that information to Garrett, since Shobert conducted the lineups. Resp. to DSF ¶ 29. Regardless of whether Garrett was the main investigating detective, it is undisputed that Shobert conducted the lineups on February 7 and 8, 1975, which resulted in the only evidence against Simmons in the criminal case—Brown's purported identifications. *See* ASF ¶¶ 20, 35-37.[14]

In addition, Simmons's actual, uncontested innocence is relevant here because, among other things, it corroborates his account and demonstrates that evidence inculpating him in the crime must have been fabricated. ASF ¶¶ 1, 43. Evidence that Simmons is innocent (which Defendant does not contest) corroborates the fact that Brown never picked him out of a lineup and a reasonable jury could find that it is therefore more likely Shobert

[14] Shobert's argument that Garrett was the lead and Edmond was the main investigative agency and therefore Shobert is not responsible is a red herring. It does not matter that Shobert was not the lead. Shobert was involved in the one thing that resulted in inculpatory evidence against Simmons—the lineups. That was the entirety of the State's case against Simmons. Shobert's involvement in the central misconduct in this case is what matters.

fabricated the Special Showup Report and the Case Record. *See, e.g., Cosenza v. City of Worcester, Mass.*, 651 F. Supp. 3d 311, 310 (D. Mass. 2023) (despite prior ineffective assistance of counsel, evidence of innocence "is relevant to fabrication" because it tended to show the plaintiff's innocence and cast doubt on the officer defendant's account); *Rubalcava v. City of San Jose*, 2024 WL 2031641, at *1 (N.D. Cal. 2024) (evidence of innocence "has a tendency to make it more probable that Defendants falsified their reports, and less probable that Defendants accurately" reported what took place); *accord Black v. West Virginia State Police*, 2023 WL 6520079, at *2 (S.D.W.V. 2023); *Howard v. City of Durham*, 2021 WL 5086379, at *6 (M.D.N.C. Nov. 2, 2021); *Tarlton v. Sealey*, 2021 WL 1845171, at *1 (E.D.N.C. May 7, 2021); *Ezell v. City of Chicago*, 2023 WL 5287919, at *15 (N.D. Ill. 2023) (expert testimony concerning unreliability of identification evidence (and thus Plaintiff's innocence) was relevant to due process claims).

Shobert argues that he is entitled to qualified immunity on Plaintiff's fabrication of evidence claim because (1) the fabricated evidence was not used against Plaintiff to deprive him of liberty, and (2) the law was not clearly established in 1975. MSJ at 22. Both arguments fail, for the reasons discussed below.

First, the fabricated evidence—that Brown picked out Simmons in the February 8, 1975 lineup—was used against Plaintiff to deprive him of liberty. In order to satisfy this element, "where, as here, the plaintiff was allegedly deprived of a fair trial, the fabricated evidence must be material, meaning there is a reasonable likelihood that without the use of the fabricated evidence, the defendant would not have been deprived of a fair trial." *Truman*, 1 F.4th at 1236 n.5. Simmons may also prevail on this claim by showing that

"there is a reasonable likelihood that without the fabricated evidence, [he] would not have been criminally charged." *Id.* This is met here, where the prosecutors relied on the fabricated evidence (the assertion that Brown identified Simmons) in order to charge him. ASF ¶¶ 2-3, 6-7. There is also a reasonable likelihood that without the use of the fabricated reports—which resulted in charges being brought and Brown testifying that she had purportedly identified Simmons—Simmons would not have been deprived of a fair trial. ASF ¶¶ 10, 45. *See, e.g., Jackson*, 925 F.3d at 816-17 (the false statement constituted the prosecutor's basis for his understanding of what witness knew; "if [the detectives] had not fabricated [the witness's] statement, therefore, charges would not have been brought, and, of course, a jury that is never empaneled is a jury that does not return a guilty verdict."); *Avery*, 847 F.3d at 439.[15]

Second, the law was clearly established long before 1975 that fabrication of evidence by police officers violates due process. *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942) (allegations of false statements and perjured testimony made under threat by police violates due process); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (state actors violate due process when they "depriv[e]

[15] Shobert's citation to pages 145-47 of Plaintiff's deposition (*see* Dkt. 124 at 22) does not show that the fabricated evidence was not used against him to deprive him of liberty. Although Plaintiff mentions February 8, he also says "it never came out in trial that she had identified somebody else…." Ex. 18 at 145. The report that shows Brown identified somebody else is the February 10 lineup report, not the February 8 Special Showup Report. Plaintiff testified that Shobert suppressed the lineup report. *Id.* at 147. The evidence supports two different theories. First, the Special Showup Report written by Shobert was fabricated and inculpatory because it stated that Brown identified Simmons in the lineup. Second, the February 10th lineup report was suppressed and exculpatory.

a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (same); *Miller v. Pate*, 386 U.S. 1, 7 (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."); *Pierce*, 359 F.3d at 1299 (citing *Pyle* for the proposition that it had been established for decades that a government official had "fair warning" that "deliberate or reckless falsification or omission of evidence was a constitutional violation); *Jackson*, 925 F.3d at 825-26 (holding that it was clearly established since at least 1935 that police officers could not fabricate evidence against a criminal defendant, citing *Mooney* and *Pyle*); *see also, e.g.*, *Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir. 1958) (when officers procure false testimony it violates the right described in *Mooney* and *Pyle*); *Smith v. Florida*, 410 F.2d 1349, 1350-51 (5th Cir. 1969) (same); *Burks v. Egeler*, 512 F.2d 221, 224 (6th Cir. 1975) (same). That officers cannot make up false evidence against a criminal defendant is self-evident. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *United States v. Lanier*, 520 U.S. 259, 271 (1997) *Halsey v. Pfeiffer*, 750 F.3d 273, 293 (3rd Cir. 2024) ("it [is] self-evident that a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process.") (cleaned up); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (proposition that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government is "virtually self-evident," and citing *Pyle* and *Miller*); *Limone v. Condon*, 372 F.3d 39, 44-48 (1st Cir. 2004) (this right is "self-evident" and was

clearly established by the events of that case, 1967, citing *Mooney*). Any minor factual differences between *Pyle* and *Mooney* do not distinguish those cases from this one.

Contrary to Shobert's argument otherwise (Br. at 22), it is not true that the constitutional right not to be deprived of liberty due to fabrication of evidence was not clearly established until *Pierce* was decided in 2004. The reason why Truman mentions the date of the *Pierce* decision is because that was all that was needed to show that the law was clearly established for purposes of that case because the defendant's actions in *Truman* took place in 2013. *Pierce* itself held that "[l]ong before the events in question [in 1986], the Supreme Court held that a defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction [citing *Pyle*, decided in 1942], or withholds exculpatory evidence from the defense [citing *Brady*, decided in 1963]." 359 F.3d at 1299. *Bledsoe* does not support Shobert's argument that the law was only clearly established by 1986. It simply cites to *Pierce*, which was a case that involved 1986 events, in order to show that the law was clearly established by 1999, the time of the events in *Bledsoe*. 53 F.4th at 612.

Shobert's citation to *Anthony v. Baker*, 767 F.2d 657 (10th Cir. 1986), is unavailing. In *Anthony*, the question before the court was whether to affirm a directed verdict, a wholly different procedural posture than the one here. *Anthony*, 767 F.2d at 664-66. The Tenth Circuit held that the district court erred in granting a directed verdict for several of the defendants, finding that there was sufficient evidence in the record of serious misconduct in the underlying investigation. *Id.* at 665. While the Tenth Circuit affirmed the directed verdict for an assisting ATF agent because there was "no evidence that [he] conspired with

[the officer] to taint the probable cause determinations or that he proceeded in a malicious manner," this fact-specific conclusion is not applicable in this case. *Id.* at 666. Here, there is evidence from which a reasonable jury could conclude that Shobert proceeded in a malicious manner by fabricating evidence and withholding exculpatory evidence, conspired with Garrett, and tainted the probable cause determinations. Resp. to DSF ¶¶ 24, 27-30, 34, 42, 44-45; ASF ¶¶ 2-9, 12, 14-17, 19, 21-23, 27, 28-29, 32-34, 39. Shobert falsified the Special Showup Report, claiming that Brown identified Simmons in the February 8, 1975 lineup when he knew that she did not. Resp. to DSF ¶ 24; ASF ¶ 39. Shobert also assisted Garrett in fabricating the statements in the Case Record stating that Brown had identified Simmons, knowing that the Case Record would be relied on by prosecutors for the charging decision and proceeding with the prosecution. Resp. to DSF ¶ 29; ASF ¶¶ 2-9. It is irrelevant that Shobert did not testify at the preliminary hearing or at trial. Of course, the prosecutors did not know that Shobert had fabricated any evidence because he never told them that he did so. ASF ¶¶ 8-10, 19, 45. And finally, it is irrelevant that Simmons did not argue that Shobert "was to blame" in his 1997 habeas petition. The types of claims that can be raised in habeas petitions are very limited, and Shobert has not explained the relevance of this fact. Such lack of argumentation constitutes waiver.

Shobert also cites to *McPherson v. Baltimore Police Department*, Br. at 24, an out-of-circuit, fact-specific district court decision that is not instructive or binding here. 2023 WL 5433011 (D. Md. 2020). In *McPherson*, the court granted defendants' summary judgment motion after analyzing the admissibility of various pieces of evidence and finding that plaintiff could not support any of his claims with evidence that would be admissible at

trial. *Id.* at *12-17. For example, the plaintiff in *McPherson* did not have any testimony from any witness about the underlying investigation and therefore could not succeed on his fabrication claim. *Id.* at 18. In this case, however, Plaintiff has plenty of evidence to support his claims. Resp. to DSF ¶¶ 24, 45; ASF ¶¶ 2-9, 19, 27-28, 39.

Shobert also makes a confusing argument that "Simmons is asking the Court to assume Detective Garrett fabricated and suppressed a report with the intent of framing Simmons but then admit Garrett's report into evidence and accept the hearsay statements within as truth regarding the circumstances of the lineups." Br. at 25. But Plaintiff's fabrication claim is that Shobert fabricated the Special Showup Report and worked with Garrett in fabricating the Case Record, which claim that Brown identified Simmons in lineups on February 7 and 8, 1975, when Shobert knew that was not true. Plaintiff does not allege that Shobert *suppressed* the fabricated evidence; the whole point of fabricating inculpatory evidence was to ensure that it was used against Simmons in his criminal proceedings to deprive him of liberty. Separately, Plaintiff alleges that Shobert suppressed the February 10, 1975 lineup report which was exculpatory.

## IV. A Trial Is Required on Plaintiff's Unduly Suggestive Identification Claim

While Plaintiff maintains that he was not present for the February 8, 1975 lineup, in the event that a jury finds that Plaintiff was present for that lineup as opposed to the one on February 7, there is evidence that the lineup was unduly suggestive. Plaintiff brings this claim in the alternative. The Supreme Court has recognized "a due process check on the admission of eyewitness identification applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the

perpetrator of a crime." *Perry v. New Hampshire*, 56 U.S. 228, 232 (2012). Indeed, it has been clearly established since 1967 that an identification procedure that is "so unnecessarily suggestive and conducive to irreparable mistaken identification" can deny a suspect due process of law. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Whether an identification procedure was constitutional depends on the "totality of the circumstances surrounding it." *Id.* Specifically, "[i]t is the likelihood of misidentification which violates a defendant's right to due process … [s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 198 (1972).

In this case, a jury could find, based on the totality of the circumstances, that the lineup procedure on February 8, 1975 was unduly suggestive. The lineups Shobert showed Brown and other witnesses were flawed and inconsistent with proper lineup procedures in 1975. ASF ¶ 45. Specifically with respect to the February 8 lineup, the height of the witnesses—assuming a jury finds Simmons was present—was significantly different. ASF ¶ 46. In addition, as Shobert well knew, Brown suffered a severe gunshot wound to her head and stated that she could not see anything for several minutes after the shooting, seriously impairing her ability to make any kind of reliable identification which was significantly compounded by the fact that Brown was showed at least 8 or 9 different lineups. ASF ¶ 46. In addition, Brown was shown the lineups in the presence of other witnesses and multiple suspects were present in each lineup, compounding the possibility of a misidentification. *Id.* Several other factors also resulted in an identification procedure

that was unduly suggestive, including the fact that Brown was identifying a partially disguised stranger of a different race, who she had limited opportunity to view and while her attention was, understandably, elsewhere. ASF ¶ 47. Considering the totality of the circumstances, a jury could reasonably find for Plaintiff's on this alternative claim.

The Court has already concluded that the law at the time was clearly established. Dkt. 39 at 6. This is amply supported by the law. *Stovall*, 388 U.S. at 302; *Foster v. California*, 394 U.S. 440, 442 (1969); *United States v. Wade*, 388 U.S. 218, 232-33 (1967); *Martinez v. Turner*, 461 F.2d 261, 264 (10th Cir. 1972). Shobert has provided no reason to depart from the Court's prior ruling, especially when he views the facts in his favor, ignores Plaintiff's facts,[16] and argues that there must be a prior case with exactly the same facts, which is not how the clearly established inquiry works. *Truman*, 1 F.4th at 1235 ("our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.") (cleaned up). The cases decided prior 1975 were enough to give Shobert fair warning.[17] Shobert is not entitled to qualified immunity on this claim.

[16] Shobert's facts on pages 32-33 are inadmissible, disputed or both. Wallentine's assertions are disputed. ASF ¶¶ 44-46. Carlson's opinions are inadmissible because he was never disclosed as an expert witness for Defendants. Dkts. 72-73. Murdock's opinions about what prosecutors were taught are irrelevant.

[17] *Lemons v. Lewis*, 963 F. Supp. 1038, 1048 ((D. Kan. 1997), is distinguishable because the suspect and fillers were similar in height, weight, and facial hair; thus, the lineup was not unduly suggestive. There is no evidence for Shobert's assertion that he did the best he could to find similar fillers. Br. at 31-32. Shobert has no memory of the lineups.

## V. A Trial Is Required on Plaintiff's Fourth Amendment Claim

To succeed on his Fourth Amendment claim, Plaintiff must show that 1) Defendants caused a criminal proceeding to be commenced or continued against the Plaintiff that resulted in the Plaintiff being deprived of his liberty or detained; and 2) there was no probable cause or commencing or continuing that criminal proceeding. *Manuel v. City of Joliet*, 580 U.S. 357 (2017); *Margheim v. Buljko*, 855 F.3d 1077 (10th Cir. 2017). The Tenth Circuit has sometimes described this claim as a Fourth Amendment "malicious prosecution" claim and included additional common law elements:: 1) defendant caused plaintiff's continued confinement or prosecution; 2) the original action terminated in the plaintiff's favor; 3) no probable cause supported the arrest, confinement, or prosecution; 4) malice; and 5) damages. *Handy v. Dobbin*, 2022 WL 5067710, at *3 (10th Cir. Oct. 5, 2022); *Thompson v. Clark*, 596 U.S. 36, 42 (2022); *Bledsoe*, 53 F.4th at 614. A reasonable jury could find for Plaintiff, and Shobert is not entitled to qualified immunity.

As a threshold matter, Shobert argues that Plaintiff does not have a Fourth Amendment claim and that he has to prove a Fourteenth Amendment substantive due process claim that involves shocking the conscience. Br. at 34-35. He misunderstands the law. *Manuel* explains that a plaintiff has a Fourth Amendment claim when he is detained pretrial without probable cause. The Supreme Court expressly held that legal process going forward without probable cause does not "extinguish the detainee's Fourth Amendment claim—or somehow … convert that claim into one founded on the Due Process Clause." 580 U.S. at 367; *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 563 (2024) ("if an invalid charge—say, one fabricated by police officers—causes a detention either to start or

to continue, then the Fourth Amendment is violated."); *see Coones v. Unified Gov't of Wyandotte Cnty./Kansas City*, 2024 WL 4345819, at *18-22 (D. Kan. Sept. 30, 2024) (recognizing Fourth Amendment claim for wrongfully convicted plaintiff); *Bledsoe*, 53 F.4th at 614 (same). After a trial and conviction, additional damages come from a Fourteenth Amendment claim. *Manuel*, 580 U.S. at 369 n.8.

A reasonable jury could find in Plaintiff's favor. Shobert contests only elements 1 and 3 of a Fourth Amendment malicious prosecution claim. *See* Br. at 35-36. But his argument is based on disputed facts. It is not "undisputed that Brown identified him as the murder suspect." Br. at 35. There was no probable cause supporting the arrest, continued confinement or prosecution because Brown never identified Simmons in any lineups, and Shobert knew it. Resp. to DSF ¶¶ 24, 27-30, 34, 42, 44-45; ASF ¶¶ 2-9, 12, 14-17, 19, 21-23, 27, 28-29, 32-34, 39. And Shobert caused Simmons's continued confinement or prosecution because he wrote in the Special Showup Report and indicated in the Case Record that Brown identified Simmons on February 8, 1975 when she did not. *Id.*, *see also* Resp. to DSF ¶ 29. Probable cause cannot be based on fabricated evidence. *Manuel*, 580 U.S. at 919; *Bledsoe*, 53 F.4th at 614. There was no "arguable" probable cause because Shobert made up any probable cause (Brown's supposed identification), and Shobert is not entitled to qualified immunity. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).

Shobert's citation to the out-of-circuit case *Washington v. Howard*, 25 F.4th 891, 906-07 (11th Cir. 2022), is unavailing. *Washington* merely stands for the proposition that there is no duty "to return to the magistrate" or "run after his warrant" with additional exculpatory information after probable cause has been established—here, there was never

any probable cause because probable cause was based on facts that Shobert made up (Brown's identification). Both prosecutors believed that Brown had identified Simmons in one or more lineups. Resp. to DSF ¶¶ 42, 44-45; ASF ¶¶ 2-10. This was based on information that Shobert had provided them. *Id*.[18]

## VI. A Trial Is Required on Plaintiff's Conspiracy Claim

To succeed on his civil conspiracy claim, Plaintiff must show the "combination of two or more persons acting in concert," and "a meeting of the minds or agreement among the defendants." *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). "Frequently a conspiracy must be proven with circumstantial evidence because rarely will there be direct evidence of an express agreement among all the conspirators to conspire." *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) (cleaned up).

Here, a reasonable jury could find that Shobert and Garrett conspired to violate Plaintiff's constitutional right to due process under the Fourteenth Amendment and his Fourth Amendment right not to be detained without probable cause. First, there is evidence from which Shobert could be found liable on the underlying constitutional claims, as discussed above. Second, there is sufficient evidence from which a reasonable jury could find an agreement between Shobert and Garrett. According to the February 10, 1975 report, Shobert and Garrett were both present for the lineups on February 7 and 8. Resp. to DSF ¶¶ 24, 27, 29-30; ASF ¶¶ 12-16. They both knew who the witnesses identified (and did not identify—e.g., Simmons). *Id.* Garrett and Shobert also talked after the witnesses

[18] Shobert cites *Moses-El v. City and Cnty. of Denver*, 2022 WL 1741944, at *16 (10th Cir. May 31, 2022). That case is inapposite; it does not remotely resemble this case.

left. Resp. to DSF ¶ 30. Yet, the Case Record contains information that claims Brown identified Simmons on February 7 and 8 when she did not, and Shobert's Special Showup Report states that Brown identified Simmons in the lineup on February 8 when (according to Simmons) she could not have. Resp. to DSF ¶¶ 24-25, 27-28; ASF ¶¶ 2-9, 12, 27-28, 39. Shobert gave that report to Garrett. *Id. see also* Resp. to DSF ¶ 27. In sum, both Shobert and Garrett knew that Brown identified other individuals in the lineups, Shobert wrote up a false report about Brown's identification, and they together wrote a Case Record containing this false information knowing that it would go to the prosecutors to file charges.

Shobert's argument relies on disputed facts. *See* Br. at 39. Viewing the facts in the light most favorable to Plaintiff, Shobert's cited cases are inapposite.

## VII. Qualified Immunity Is Contrary to the Text of Section 1983

In addition to the arguments made above, Defendant is not entitled to qualified immunity on any of Plaintiff's claims because there is no statutory or common law basis to afford immunity to police officers who are sued under § 1983 for violations of the constitutional rights of civilians. This Court should reject Defendant's immunity arguments for that reason alone. The Supreme Court has said that "statutory interpretation, as we always say, begins with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and the US code version of the text of § 1983 is clear: "Every person who, under color of any statute … subjects … any citizen of the United States … to the deprivation of any rights, privileges, or immunities … *shall* be liable to the party injured in an action at law." 42 U.S.C. § 1983 (emphasis added). The word "shall" typically means "must." *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word "may," which implies

discretion, the word "shall" usually connotes a requirement."); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("shall" connotes a mandatory duty is used by Congress "to impose discretionless obligations"). There is no room in the statute for immunity that means an officer *may* be liable, and certainly, only may be liable if the law was "clearly established" at the time of the conduct. Congress does not mention immunity in the statute, and the judicially created qualified immunity test "cannot be located in § 1983's text and may have little basis in history." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting denial of certiorari). Qualified immunity contradicts the text of § 1983.

Making matters worse, qualified immunity is expressly foreclosed by the actual text of § 1983 that did not make it into the US code. Qualified immunity arises from the premise that Congress did not intend to abrogate existing common-law immunities when it first passed § 1983 in 1871. *E.g.*, *Pierson v. Ray*, 386 U.S. 547, 556-57 (1967). But it turns out that premise is wrong. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023). As passed by the Reconstruction Congress, Section 1 of the Civil Rights Act of 1871—now known as § 1983—provided:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added).

The bolded notwithstanding clause in Congress's originally promulgated text of § 1983 expressly displaces common-law defenses—it states that common law immunities

will *not* protect state actors from suit under § 1983. Reinert, *supra* at 235 & n.230. But the notwithstanding clause was accidentally omitted from the first compilation of the law in 1874, and it has been missing—but never amended—from then. Reinert, *supra* at 207, 236-37, 244. "[T]he Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). Thus, "modern immunity jurisprudence is not just atextual but *counter*textual." *Id.*

Lastly, even if there were no textual argument against qualified immunity, there is nothing in the common law of 1871 that would permit the conclusion that officers who violated the constitutional rights of civilians enjoy immunity from suit. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring) (citing William Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 45 (2018)); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (Sotomayor, J., dissenting); *Richardson v. McKnight*, 521 U.S. 399 (1997). An officer who maliciously prosecuted an innocent person based on false evidence would certainly have been subject to suit at common law in 1871. *See Thompson*, 596 U.S. at 43-44. A fiction that Congress afforded common-law immunity to officers who commit such misconduct without saying so stretches the judge-made conception of qualified immunity far beyond its breaking point. *See Green v. Thomas*, 734 F. Supp. 3d 532, 543-48, 560-68 (S.D. Miss. May 20, 2024).

## CONCLUSION

For the foregoing reasons, Shobert's motion must be denied.

Respectfully submitted,

GLYNN SIMMONS

By: s/ Elizabeth Wang
One of Plaintiff's Attorneys

*Counsel for Plaintiff:*
Jon Loevy
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: (312) 243-5900
jon@loevy.com
poole@loevy.com

John Coyle, III
COYLE LAW FIRM
125 Park Ave., Ste. 100
Oklahoma City, OK 73102
O: (405) 232-1988
jc@coylelaw.com

Elizabeth Wang
LOEVY & LOEVY
Boulder, CO 80302
O: (720) 328-5642
elizabethw@loevy.com

Joseph Norwood
NORWOOD LAW FIRM P.C.
1717 S. Cheyenne Ave.
Tulsa, OK 74119
O: (918) 582-6464
joe@oklahomaadvocate.com

**Certificate of Service**

I, Elizabeth Wang, an attorney, hereby certify that on January 10, 2025, I served the foregoing response on all counsel of record electronically by filing it via CM/ECF.

s/ Elizabeth Wang